COMMONWEALTH *vs.* DANIEL JOSEPH REDMOND.

Worcester.    May 4, 1976. — July 6, 1976.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Comment by prosecutor, Mistrial.

Where the prosecutor during a murder trial, both in his cross-examination of the defendant and in his summation to the jury, repeatedly and deliberately went beyond permissible limits referring to matters not in evidence, the cautionary instructions of the judge were insufficient to cure the resulting prejudice to the defendant. [593-597]

INDICTMENTS found and returned in the Superior Court on May 17, 1974.

The cases were tried before *Hayer,* J.

*Joseph J. Balliro* for the defendant.

*Manuel Morse,* Assistant District Attorney (*Francis R. Fecteau,* Assistant District Attorney, with him) for the Commonwealth.

BRAUCHER, J.   The defendant appeals under G. L. c. 278, §§ 33A-33G, from convictions of murder in the first degree, burglary while armed, and armed robbery. We hold that the prosecutor, both in his cross-examination of the defendant and in his summation to the jury, repeatedly and deliberately went beyond permissible limits, and that the cautionary instructions of the judge were insufficient to cure the resulting prejudice to the defendant. We therefore reverse the judgments and remand the case for a new trial.

There is substantially no dispute as to the following facts. On Friday, February 22, 1974, the defendant, a young man of twenty, went to a party to which the host had not invited him. He drank tequila and beer and was in several fights. About 2 A.M. on February 23, he was ob-

served walking on the street in the direction of the victim's home, some 1,000 feet away. The victim, a woman of twenty-nine, was alone in her home that night. Between 2 A.M. and 6 A.M. she was stabbed forty-eight times and killed in circumstances which warranted a finding of extreme atrocity or cruelty. The defendant's fingerprints were on two partially empty beer bottles found in the house. About 6:30 A.M. the defendant called a taxicab from the victim's home, carried loot from the house to the taxicab in two trips, and took the loot to his home. About 11:30 A.M. the police arrested the defendant in a car driven by one Davis; Davis's girl friend was also in the car, as was the loot from the victim's house, and the defendant was wearing two rings taken from that house.

Davis and his girl friend gave additional testimony. According to Davis the defendant telephoned him Friday evening and asked Davis to get him a gun, a knife and a car. Davis refused. Saturday morning the defendant again called Davis, said "he had some stuff he wanted to sell" and "I will give you a couple hundred dollars if you give me a ride." Later that morning Davis and his girl friend met the defendant in front of his home. Davis helped the defendant load the loot into the girl friend's sister's car, and they drove to various places where the defendant thought he might sell the loot. During the ride Davis asked the defendant about his black eye, and the defendant said "he wanted to ball this girl and she didn't like to ball so she slapped him in the eye and he slapped her back." In the girl friend's version the defendant said "he had tried to ball a chick the night before and she put up some kind of fight and slapped him, and he pointed to his eye and he said, 'Gave me this,' and he said, 'So I slapped her back and left her dead, lying dead on the floor.' "

The defendant testified that in addition to tequila and beer he took ten "truckers" (amphetamine pills) the night of the party, that he called Davis from the party to get a ride home, and that Davis picked him up in a car. He was then cut, bruised, beaten and nauseated. Davis said it was a wealthy neighborhood and some time later stopped at

the victim's house. Davis said it looked like a nice house. The defendant said he didn't feel good, he just wanted to go home, he was sick and he hurt and he was going to vomit. He saw Davis ring the doorbell and then go around the side of the house, and then he passed out. Later he woke up and went into the house. Davis was putting things in bags, and the defendant had a beer and went upstairs and helped Davis sort jewelry. The defendant saw the victim's body and started screaming, and attempted to take her pulse. Davis left. When the defendant got home by taxicab about 6 A.M., Davis met him, they put the loot in Davis's car, and the defendant went into his house. About 8:30 A.M. Davis telephoned him and asked, "Can you fence the stuff now?" The defendant said yes, and later Davis drove to the defendant's house. The defendant denied the conversation about slapping a girl.

1. *Cross-examination of the defendant.* In a voir dire hearing during the presentation of the prosecution's case one of the arresting officers testified to statements made by the defendant at the time of his arrest. These included "none of you have any brains," "You don't go to college like I do. I go to Clark University and take up sociology and psychology." When told he was going down to the police station, the defendant said, referring to the loot, "Well, if I am going, I want my clothes, they're in the rear seat of the car." The judge ruled that these statements were not voluntarily given and were to be suppressed in so far as they related to the clothes.

The prosecutor opened his cross-examination of the defendant with reference to the defendant's testimony that he went to Clark University and studied psychology and sociology. The next question was, "And, you have made the statement to police officers on many occasions that you were an educated individual and that they were dumb cops, isn't that so?" The judge denied the defendant's motion for a mistrial, but sustained his objection to the question. The question was withdrawn and the jury were instructed to disregard it.

After the defendant had testified to leaving the party

early Saturday morning, he denied stopping at another house on his way up the street. The prosecutor then asked, "Don't you recall, Mr. Redmond, that on your way up Saxon Road, in accordance with the map, that you stopped into a house and threw a hurricane lamp at the lady?" There had been no previous testimony to such an incident, and the defendant objected that the question called for testimony as to an unrelated crime. The judge again denied the defendant's motion for a mistrial, but sustained the objection and instructed the jury to disregard the question.

After the defendant had testified to his arrest, the prosecutor asked, "And as you were about to leave you said to Mr. Guerry, 'I want my clothing in the back of the car'?" The defendant objected that the conversation had been suppressed, and the prosecutor argued that it was admissible under *Harris* v. *New York*, 401 U.S. 222 (1971), and *Commonwealth* v. *Harris*, 364 Mass. 236 (1973). Again the judge denied the defendant's motion for a mistrial, this time based on the cumulative effect of the improper questions. Again his objection was sustained, the question withdrawn, and the jury were instructed to disregard it.

The trial was then in recess. When it resumed the following day, the prosecutor promptly inquired whether the defendant had some conversation with the arresting officer. The defendant answered yes, and the prosecutor then added, "And you asked him, did you not, if you were going down to the Police Headquarters?" The defendant answered yes. Again the judge denied the defendant's motion for a mistrial, but sustained his objection and instructed the jury to disregard the question.

2. *The prosecutor's summation.* During his argument to the jury, the prosecutor described the murder scene and said, "And, I argue to you that the person that was up in that room that morning . . . attempted to do something. I say that he attempted to rape." This was speculation and conjecture; there was no such evidence, and the prosecutor said he did not ask for an instruction on felony murder in

the commission of rape. The judge denied the defendant's
motion for a mistrial, said he would cover the matter in
his instructions, and added, "I would suggest you keep
away from that." The prosecutor finally said, "All right,
I won't mention rape." The judge then told the jury that
arguments of counsel are not evidence, that as to rape or
attempted rape they were the sole judges of what took
place, and that he would ask them to consider it at a later
time when he would give them the full charge. The prose-
cutor then described the scene again, held up the defend-
ant's blood-stained undershorts, and said, "Did he go up
and take her pulse? You don't have to take your pants
down to take a pulse." On the defendant's objection, the
judge said, "Again I point out to you, ladies and gentle-
men, the argument is not evidence. And, it is for you to
determine what the evidence is, and for you alone."

Davis had testified that at the time the defendant was
arrested Davis was driving without a license. He expected
to be charged with receiving stolen goods, but he was not
arrested and no reference was made to any charge against
him. He had been convicted in January, 1973, of breaking
and entering a dwelling in the nighttime and of unautho-
rized use of a motor vehicle and sentenced to one year in
a house of correction. In June, 1973, he was convicted of
unauthorized use of a motor vehicle and of escape. In
May, 1974, he was indicted for an armed robbery on Feb-
ruary 14, 1974, and another indictment against him was
returned in November, 1974, but no trial had been held
when he testified in January, 1975. He testified that he did
not expect favorable treatment. Defense counsel in his
summation to the jury suggested that Davis expected
some consideration by reason of his statement and that of
his girl friend.

Responding to this argument, the prosecutor said, "Alan
Davis will get his reward when he's prosecuted for that
armed robbery charge that my Brother talked about,
that's still pending.... My brother well knows the con-
gestion of the criminal dockets." On objection by the
defendant, the judge again instructed the jury that argu-

ments of counsel are not evidence, but denied the defendant's motion for a mistrial. The prosecutor then said, "I suggest to you that Alan Davis, based on that indictment that is pending against him and still open, will be prosecuted vigorously." The judge again denied the defendant's motion for a mistrial, and instructed the jury that "the issue whether anybody will be prosecuted vigorously or not is not in this case." The prosecutor then continued, "I suggest to you that Alan Davis testified regarding the indictment pending against him and he testified that he expects to be prosecuted and he will pay for any crime that he committed, isn't that the testimony in this case?" A motion for a mistrial was again denied, the judge suggested "that we stay away from this particular problem," and the jury were instructed that their memory of the evidence controlled.

3. *Prejudice.* Although no question is before us as to the judge's rulings adverse to the Commonwealth, we think it proper to say that the rulings we have described should have been anticipated by the prosecutor. In each case, however, the cat was to some extent out of the bag: the effect in each case was to bring to the jury's attention unsworn testimony of the prosecutor in the form of an excluded question or a purported argument. Commonly such prejudicial effects are neutralized adequately by instructions to the jury to disregard the question or argument. See *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 537 (1971). The difficult question in the present case is whether the judge's cautionary instructions were sufficient.

On the one hand, the case against the defendant was a strong one, even without Davis's testimony. The defendant's credibility was thoroughly impeached by his own testimony as well as by evidence of thirty prior convictions of crime. In many respects his testimony corroborated testimony on behalf of the Commonwealth, and in any event the jury were not bound to and obviously did not believe him. We are not prepared to rule that any one of the trial incidents we have recounted, taken by itself,

was necessarily so prejudicial that curative instructions were useless or that the instructions given were inadequate.

On the other hand, the circumstances were such as to create a serious danger of prejudice against the defendant. Most of the defendant's prior convictions were for breaking and entering, and there was an obvious danger that they might be the basis for inferences going beyond credibility. Cf. *Commonwealth* v. *Sheeran, ante,* 82, 88 (1976). The case was largely presented as a contest between the account of Davis and his girl friend and the account of the defendant. The defendant's version was not such as to excite admiration or sympathy for him. In these circumstances, particular care was needed to assure that the central issues were tried factually and dispassionately, without inflammatory diversions.

Instead, the prosecutor repeatedly and deliberately sailed unnecessarily close to the wind, and, as the judge ruled, went beyond permissible limits. Cf. *United States* v. *Brown,* 519 F.2d 1368, 1370 (6th Cir. 1975). In such circumstances we have a duty to be skeptical as to the effectiveness of limiting instructions. Cf. *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 681 (1974) (Hennessey, J., concurring). We conclude that the cumulative effect of the incidents we have recounted may have been significant prejudice, and we order a new trial.

4. *Other issues.* The defendant also assigns error in the violation of the judge's order sequestering witnesses, and in the surprise assertion in closing argument and in the judge's charge that the defendant could be found guilty on the basis of a joint enterprise with Davis. These issues are not likely to arise in the same way at a new trial, and we do not consider them.

*Judgments reversed.*
*Verdicts set aside.*