COMMONWEALTH vs. CHARLES W. HAWLEY
(and four companion cases [1]).

Berkshire. November 6, 1979. — March 5, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Directed verdict, Argument by prosecutor. *Perjury.*

At the trial of two defendants charged with perjury in connection with
    their testimony at a hearing on their motions to withdraw guilty pleas
    to manslaughter charges, in which they alleged misconduct on the part
    of their defense attorneys, the district attorney, an assistant district at-
    torney, and unnamed police, there was sufficient evidence to warrant
    denial of their motions for directed verdicts. [79-82]
Where the prosecutor at a perjury trial in his closing argument improp-
    erly referred to the defendants' failure to take the stand and suggested
    that defense counsel was an active participant in the commission of the
    crimes of perjury, the judgments of conviction were reversed. [82-88]

INDICTMENTS found and returned in the Superior Court
on March 17, 1977.

The cases were tried before *Tamburello,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

The case was submitted on briefs.

*Charles W. Hawley & Terry Lee Gibney,* pro se.

*Anthony J. Ruberto, Jr.,* District Attorney, *& Daniel A.
Ford,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendants Charles W. Hawley and
Terry Lee Gibney, jointly tried and convicted by a Berk-
shire County jury on indictments for perjury (G. L. c. 268,
§ 1), took their appeals pursuant to G. L. c. 278, §§ 33A-

---

[1] Of the companion cases, three are against Charles W. Hawley; one is
against Terry Lee Gibney.

33G, and we transferred the cases here on our own motion. Their joint assignments of error are numerous but we need not canvass them all.[2] We hold that there was no error in the denial of their motions at the close of the Commonwealth's case for directed verdicts of acquittal, but that the judgments should be set aside because of improper statements by the prosecutor in his argument to the jury.

The perjuries were charged to have been committed in the course of the defendants' testimony at a hearing on March 4, 1977, upon their respective motions to withdraw their pleas of guilty of the manslaughter of one Adriel Bidwell. The pleas had been entered on February 4, 1976, at the commencement of their trial on indictments charging the murder of Bidwell in the first degree. We describe the outward appearance, so to speak, of the taking of the guilty pleas, and add some preceding and following events. Then we go on to the alleged seamy underside of these pleas, as the defendants' testimony attempted to describe it, on the motions to withdraw the pleas, which were denied. We pass then to the perjury indictments and trial deriving from that testimony.

1. *Guilty pleas; hearing on reduction of sentences.* Bidwell was murdered in July, 1975, and Hawley and Gibney (then aged eighteen and nineteen years), together with one Robert Dennis, were indicted for the crime on October 9, 1975. In that month, at arraignments, the court appointed Mr. William W. Simons as counsel for Hawley and Mr. George B. Crane for Gibney. They were experienced trial lawyers.

As empanelment of jurors began on February 3, 1976, Hawley told the trial judge, "I just don't have full faith in Mr. Simons" (without furnishing details), and asked for a new lawyer. This the judge refused. It appeared at this time and was known to Hawley and Gibney that Dennis (the one of the three who actually struck Bidwell) would

---

[2] At their insistence, the defendants filed a brief pro se, but it is indicated that trial counsel rendered some help in its composition.

probably testify for the Commonwealth. Simons and Crane had consulted with the assistant district attorney presenting the cases, Mr. William R. Flynn, and a "bargain" was struck that in exchange for pleas to manslaughter, Flynn would recommend eight- to fifteen-year sentences and would not oppose a request that they be served at the Berkshire County house of correction. On February 4, after counsel explained the situation to them and they had consulted between themselves, Hawley and Gibney agreed to make the pleas on the bargained basis.

The same day, February 4, the lawyers met with the judge and informed him of the plea arrangements. A hearing was then held to receive the pleas. Flynn gave an account of the crime and recommended eight- to fifteen-year sentences. The judge made a thorough inquiry into the "voluntariness" of the proffered pleas. Among other things he inquired about inducements to plead guilty and whether the defendants had any complaints about their lawyers. Satisfied on these and other points, the judge said, as reported in the transcript: To Hawley — "I still have an open mind on the eight to fifteen years. . . . In other words, I'll go along with any sentence being served in the Berkshire Jail, but it's open as far as the term of years." To Gibney — "when I say I won't go along with it, I might lower it, but in all frankness I would rather doubt that. In other words, I'm not bound and I'm not binding myself to any number of years. I'll determine that tomorrow . . . ." Did the defendants still want to plead guilty to manslaughter (carrying a maximum sentence of twenty years)? The defendants said they did. Next day, after hearing counsel for the defendants, the judge imposed, not the "bargained" sentences, but sentences of eighteen to twenty years to Massachusetts Correctional Institution at Walpole, with a recommendation that they be served at the Berkshire County house of correction.[3]

---

[3] In *Gibney* v. *Commonwealth*, 375 Mass. 146 (1978), we held that the judge was not required to give the defendants a chance to withdraw their pleas after it appeared that the judge had not acquiesced in the "bargained" sentence.

We omit reference to other attempted but so far ineffectual attacks on the judgments based on the guilty pleas.

The defendants applied to the Superior Court, Appellate Division, pursuant to G. L. c. 278, §§ 28A-28D, for reduction of sentences. The applications were heard on May 5, 1976. Mr. Matthew J. Ryan, Jr., the district attorney for the Western District (Berkshire and Hampden counties), appeared and argued against the reduction. Simons and Crane urged reduction at least to the level agreed with Flynn. On May 28 the Appellate Division refused relief. It appears that thereafter Simons and Crane ceased to represent the defendants.

2. *Motions to withdraw pleas.* On February 22, 1977, some eleven months after the pleas, Hawley and Gibney moved to withdraw them.[4] In accompanying affidavits they alleged misconduct by Simons, Crane, Flynn, Ryan, and police (unnamed) of several towns; there were also claims that the trial judge had reneged on his supposed agreement to sentence them to eight to twelve years.[5]

Several of the allegations of misconduct were related to the prosecutions of Eugene Graziano and Antonio Facente, and we divagate for a moment to speak of these two, noting that the attorney who represented them was now also representing the present defendants on their motions to withdraw pleas. Graziano and Facente had been convicted by a Springfield jury on February 2, 1973, of the murder in the second degree and armed robbery of William Griffin while they were trying to collect from him on a cocaine sale. On July 19, 1975, this court reversed the convictions because of improper restriction of the cross-examination of a prosecu-

---

[4] Although the same judge presided at the motions who had received the pleas, counsel did not ask him to recuse himself until the first day's hearing was half over. The judge, remarking correctly that "a motion like that should be made well before the proceeding starts," denied the application. He mentioned that he was intimately acquainted with the case. The affidavits initiating the withdrawal motions so far as they related to the judge might be read as simply contradicting the transcript on acceptance of the guilty pleas and making no definite charge of misconduct against him.

[5] The defendants have insisted that the "bargain" was eight to twelve, not eight to fifteen.

tion witness, and at the same time disapproved inflammatory remarks by the prosecutor in his summation to the jury. *Commonwealth* v. *Graziano*, 368 Mass. 325 (1975); see also 371 Mass. 596 (1976). The two men were retried and on November 26, 1977 (five months after the perjury trial herein), were acquitted of the charges. Facente had been under charges since March 13, 1973, of intentionally burning insured property and submitting a false insurance claim (G. L. c. 266, §§ 10, 111A); his cases were ultimately dismissed on April 3, 1979.

Returning to the motions to withdraw pleas, Hawley testified on March 4, 1977, that Graziano was held at the Berkshire jail during the latter part of 1975 while Hawley was also detained there, and they conversed on several occasions. Hawley had seen Graziano a few times some five years earlier when Hawley was "helping out" at a Springfield gas station which Graziano used to frequent. Hawley did not know Facente except through the newspapers (the Graziano-Facente prosecution was widely publicized).

Hawley said that on November 20, 1975, police of Springfield, Westfield, and Agawam visited him at the Berkshire jail. The Springfield police[6] handed him a paper purportedly signed by Ryan (but now lost; its content was not made clear). These officers asked Hawley to agree to testify that Facente in July, 1972, offered him $100 to set fire to Facente's house (Hawley would have been fourteen years old at the time); also that Graziano told him at the Berkshire jail that he (Graziano) had shot Griffin in circumstances consistent with the prosecution's theory. If Hawley testified to such effect, he would serve little if any time in the Bidwell matter; if he did not, he would be sentenced to life imprisonment. Ryan had the power to harm or protect him. Hawley told the police he would think about their proposition.

Hawley testified he told Simons of the meeting sometime in January, 1976, and Simons advised him to accept the

---

[6] Hawley had nothing to say in his testimony about any talk with Westfield or Agawam police.

deal. In another conversation with Simons on February 3, 1976, Hawley recurred to the proposal of the Springfield police. He also said his mother had visited him about January 10, 1976, and said Dennis's father offered her $30,000 if Hawley would "take the rap" for Dennis and testify against Graziano.[7] Simons said, according to Hawley, that no lawyer in the State could risk attacking Ryan, that Hawley should go along with the police deal or he would find himself convicted of murder in the first degree with a life sentence.

According to Hawley, also on February 3, after his conversation with Simons, he encountered Flynn as he was walking to a rest room in the court house unescorted and without handcuffs. They talked alone in a hallway for about two minutes. Flynn asked whether Hawley was agreeing to give testimony. Hawley said no. Flynn said, "Okay, you'll pay." Hawley reported the conversation to Simons and Simons stated he would have to accept the deal or plead guilty.

Next day, Hawley testified, he told Simons that he would have to go to trial because he could not agree to the deal. In that case, Simons said, he would not represent Hawley, for if they went to trial Hawley would get "first degree life." However, in a stenographic record of a meeting between Hawley and Simons on February 4 — a record made at the judge's suggestion — there is a bland discussion of trial tactics; Simons asks, "Is there anything you feel I haven't done that you want me to do?" and, "Are you unhappy with anything I've done so far?"; Hawley answers, "No"; and the conversation ends with Simons asking, "Are you ready to start the trial?" and Hawley answering, "Yeah."

With respect to the plea bargaining with Flynn, Hawley said that on the morning of February 4 Simons told him the bargain was now eight to twelve years on manslaughter

[7] Like various other elements of the defendants' story, the testimony about the mother does not hang together easily or clearly connect with the theme of some concerted action against the defendants which might have resulted in unjust sentences for manslaughter.

pleas, and that the judge had agreed to those pleas. After a private discussion, Hawley and Gibney yielded in order not to be "railroaded" and on Simons's assurance that the judge was bound by the bargain. Simons then, according to Hawley, instructed him to answer the judge's questions "yes," except the question whether a deal had been made as to sentences, which he was to answer "no." Hawley testified that at the court hearing that followed that day the judge said he would go along with the plea bargain (the transcript reads differently, as we have seen). Then followed on February 5 the sentences of eighteen to twenty years.

Hawley went on to testify to a private conversation with Ryan on May 5, 1976, at the court house in Wrentham where the Appellate Division heard argument. Ryan cornered him as he was walking in a corridor, again unescorted and without handcuffs, and asked him whether he was going along with the deal. When Hawley said no, Ryan said, "Don't expect anything to happen" by way of reduction of sentence. The conversation took about two minutes. Later in the day, Hawley said, he returned a call ostensibly from Simons, but in fact Ryan was talking and asked whether he had changed his mind. Hawley said he replied that he was not going to go along with the deal; Ryan answered, "Well, under no means will your sentence be reduced."

So much for Hawley's testimony on March 4, 1977. Gibney took the stand to testify that Crane and Simons met with him on February 4, 1976, and said that if he and Hawley did not plead guilty to manslaughter, "they would help Mr. Ryan into railroading us into a first degree murder conviction." (However, the stenographic record of a meeting between Gibney and Crane the day before deals only with trial tactics and the state of negotiations with Flynn.) The lawyers also said, according to Gibney, that they had had a meeting with the judge and he was going to accept the eight- to twelve-year sentences Flynn would recommend. Gibney testified that the judge said at the hearing that "he would go along with the recommendation, but he isn't binded by the District Attorney's — that he could give us

lesser time." Question: "Well, did he say it could be more time?" Answer: "No, he didn't say anything like that. All he did was mention lesser time to us." (Again inconsistent with the transcript.) Finally Gibney swore that, while Hawley was on the stand, testifying at the hearing to withdraw the guilty pleas, Ryan said he would get them — Hawley and Gibney — sentenced to ten additional years or life imprisonment for the testimony they were giving that day.

The Commonwealth's evidence in response to the case for withdrawal of pleas need not be set out here. It paralleled the Commonwealth's proof at the perjury trial which will be mentioned below.

On March 9, 1977, the judge denied the motions, and on April 5 he filed comprehensive findings listing a number of allegations made by Hawley and Gibney in their affidavits and testimony and finding them to be untrue.[8] When questioned, the judge had left it to the district attorney whether perjury indictments should be brought.

3. *Perjury trial.* On March 17, 1977, the defendants were indicted for perjury. Five indictments with a total of twelve counts named Hawley; Gibney was charged in three indictments comprising four counts. After trial over a period of seven days, the jury brought in verdicts: as to Hawley, guilty on seven counts, acquitted on five; as to Gibney, guilty on two counts, acquitted on two.[9] The sen-

---

[8] We pass over an effort to preserve appeal from this decision.

[9] *As to Hawley.* Indictment 14820: five counts regarding visits and statements by police. Indictment 14819: three counts relating to statements attributed to Simons on February 3, 1976. Indictment 14823: one count concerning a conversation with Flynn on February 3, 1976. Indictment 14821: one count concerning the judge's agreement to sentence according to the plea arrangement. Indictment 14822: two counts about occurrences at the Appellate Division hearing on May 5, 1976.

Hawley was acquitted on indictment 14820 with five counts and found guilty of the rest.

*As to Gibney.* Indictment 14825: two counts concerning the conversation with Crane and Simons on February 4, 1976. Indictment 14824: one count about the judge's agreement. Indictment 14826: one count about Ryan's threats at the plea withdrawal hearing.

Gibney was acquitted on indictments 14824 and 14826, and convicted on indictment 14825 with two counts.

tences imposed, to be served from and after the manslaughter sentences, amounted, for Hawley, to four to seven years at M.C.I. Walpole, then three and one-half years at a house of correction; for Gibney, four to seven years at M.C.I. Walpole, then two and one-half years at a house of correction.[10]

We deal with some elements of the perjury trial. A certain turbulence was injected by a change of defense counsel on the eve of trial. About a week after the indictments, the court assigned counsel to Gibney; as Hawley wished to proceed pro se, he was assigned an attorney "adviser." These appointments were terminated on June 8, 1977, the day trial was set to begin, as the defendants stated they had retained (or were about to retain) the attorney who had represented them on retainer at the hearing on withdrawal of pleas. The judge — not the judge who had presided at the previous proceedings — set the trial forward to June 14. On that day the substituted counsel moved for a continuance so that he might prepare for trial; as an alternative ground for continuance, pretrial prejudicial publicity was cited. Also applied for was a change of venue: an impartial jury could not be selected in this locality, it was contended, because of the high esteem in which the citizenry held the attorneys who would be testifying for the Commonwealth; pretrial damaging publicity was cited in this connection also. In addition counsel moved (renewing a similar prior motion by Hawley pro se) for the appointment of a special prosecutor in lieu of the assistant district attorney undertaking to try the case: the Commonwealth, counsel urged, should not be represented by a subordinate of the district attorney whose behavior (and that of one of his associates) was necessarily being put in question in

---

[10] More specifically, Hawley received concurrent four- to seven-year sentences at M.C.I. Walpole on the three counts of indictment 14819 and the single count of indictment 14821; two and one-half-year concurrent sentences following these on the two counts of indictment 14822; followed by the one-year sentence on the single count of indictment 14823. Gibney received his four- to seven-year sentence on count one of indictment 14825, followed by the two and one-half-year sentence on the second count of the same indictment.

the very case.[11] These motions were denied and the trial went forward.[12]

4. *Directed verdicts of acquittal properly denied.* The Commonwealth's evidence consisted of the following: a reading of the transcripts of the defendants' statements on acceptance of their pleas and of their testimony on the attempted withdrawal of the pleas (the entire transcripts of their testimony, except some colloquies between counsel and the court, were admitted in evidence); testimony of Simons, Crane, Flynn, and Ryan; parts of a book recording visits by police to the Berkshire jail when the defendants were held there; testimony by nine court officers attending respectively at the taking of pleas on February 4, 1976, and the sentence reduction hearing on May 5, 1976; testimony of Westfield and Springfield detectives.[13]

Simons denied having told Hawley on February 3, 1976, or at any other time to agree to testify in the Graziano-Facente case on pain otherwise of suffering the severest punishment for the Bidwell homicide. He denied making the statements about Ryan attributed to him. Simons denied saying that the judge had agreed to go along with eight- to twelve-year sentences or instructing Hawley to answer in a particular way the question of a "deal" for sentence. Supporting Simons's denials was the transcript of his conversation with Hawley on February 4; also Hawley's failure the day before to supply particulars to the judge about his discomfiture with counsel, and his raising no com-

---

[11] Counsel also suggested that the court require the Attorney General to take over the case, citing G. L. c. 12, § 3.

[12] As mentioned earlier, we confine this opinion to two points — directed verdict and prosecutor's misconduct. The defendants have argued, in addition, the issues of refusals of continuance, change of venue, appointment of special prosecutor, and requested polygraph examinations; and questions regarding issuance of witness summonses and appointment of investigator, appearance of defendants in chains, admission of entire transcript of the March 4, 1977, hearing, and judge's instructions and comments.

[13] In the account that follows in our text, we point to the facts regarding the counts on which the defendants were found guilty.

plaint about his counsel at the plea acceptance hearing. Indeed the offer of a plea bargain (and with a minimum of eight years) was itself inconsistent with Simons's supposed assertion that Hawley faced a choice between testifying at the Graziano-Facente trial and being imprisoned for life on the Bidwell murder charge. Simons swore he explained clearly that the judge was not bound by the prosecutor's recommendation, and that proposition was made clear on the transcript of the hearing. The eight to fifteen years actually recommended differed from the eight to twelve supposedly promised as, of course, did the sentence imposed, but Hawley made no protests at the time.

Flynn denied any private conversation with Hawley around the time of jury selection, and court officers assigned to watch Hawley refuted the probability. The setting was itself improbable.

Ryan testified he had never seen the defendants until the May 5 hearing at Wrentham, and denied the private meeting with Hawley there as well as the supposed telephone call. There was corroboration of Ryan's testimony by court officers, Simons, and Crane.

Denials by both Simons and Crane that they threatened the defendants with "railroading" or made the other statements attributed to them at their meeting with Gibney impeached Gibney's account of that meeting. No particular reason appeared why the attorneys should want to see Gibney railroaded. We have again the transcript of the meeting between Gibney and his counsel as well as the transcript of the plea acceptance hearing and in each situation Gibney's reactions, matching Hawley's mentioned above, were inconsistent with his statements on which the perjury charges against him were grounded.

Neither defendant took the stand. Offered in defense was a reading of testimony at the plea withdrawal hearing and at a March 21, 1977, hearing in Springfield of Jeffrey Meehan, an appellate law clerk who accompanied Ryan to the Wrentham hearing, Meehan being unavailable (he said he had been separated from Ryan for about thirty seconds

that day and did not see any communication with Hawley; he also said he was "loyal" to Ryan). Also tendered was testimony from the witness stand of Hawley's mother about the $30,000 offer from Dennis's father which she claimed to have reported to Hawley and Simons, and also to her attorney on an unrelated matter. Both Simons and her personal attorney in rebuttal denied that the mother had reported such an offer to them or that they had other knowledge of it.

Largely through implication in the cross-examination of Simons, Flynn, and Ryan, and through volunteered statements before the jury and in his opening statement and closing argument, defense counsel suggested that Simons and Crane, and members of the district attorney's office, with the judge perhaps assisting, had conspired to punish the defendants for Hawley's refusal to agree to testify against Graziano and Facente, or alternatively, that the district attorney's office was pressing for conviction in order to impair Hawley's credibility as a witness if he should testify in favor of Graziano and Facente at their retrial, as the present counsel for Hawley and Gibney wanted him to do. (For his refusal to follow the judge's repeated admonitions, counsel was subsequently held in contempt.)

We refrain from further detail, and revert to the question of the sufficiency of the evidence at the close of the Commonwealth's case. There was enough for a jury under the accepted standard. *Commonwealth v. Latimore*, 378 Mass. 671, 677 (1979). In their brief the defendants all but concede the point. However, they press an argument not made to the trial judge and so, in strictness, unavailable here. They invoke old authority intimating that two witnesses must testify in direct contradiction to the statement charged as perjurious before it can be found so. This would make prosecution impossible where the defendant says — falsely, as the prosecution wishes to charge — that someone made a certain statement to him in private. The old conception perhaps derived from the presumption of the defendant's innocence, which might suggest that his oath must be considered as good as the next man's. See *Com-*

monwealth v. *Douglass*, 5 Met. 241, 243 (1842). By the time of *Commonwealth* v. *Parker*, 2 Cush. 212, 223-224 (1848), it was held that "all that is requisite to a conviction of perjury is, that, in addition to one directly opposing witness, there should be established, by independent evidence, strong corroborating circumstances, of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence." Considering the evidence adduced here, we think the *Parker* test was met in the sense of what a reasonable jury might find on the basis of the evidence when the Commonwealth rested.

We observe that recent decisions indicate that *Parker* is too mechanical. It has not been applied to subornation of perjury, see *Commonwealth* v. *Fine*, 321 Mass. 299, 302-303 (1947), and appears disfavored in *Commonwealth* v. *Gale*, 317 Mass. 274, 277-278 (1944), and *Commonwealth* v. *Giles*, 353 Mass. 1, 20 (1967). This follows the trend toward "eliminating quantitative tests of the sufficiency of evidence." *Commonwealth* v. *Gale, supra* at 277. See 7 J. Wigmore, Evidence § 2042 (Chadbourn rev. 1978). If a "quantitative" test is abandoned, triers may nevertheless bear in mind that "talk is cheap" and the Commonwealth bears the burden of proving knowing falsity, as well as "materiality"[14] beyond a reasonable doubt.

5. *Prosecutor's improper statements.* (a) *The questioned remarks.* In a closing argument running to seventeen transcript pages, the assistant district attorney made a series of improper remarks, of which the Commonwealth itself says, with some understatement, that he "might, with the benefit of coolly reasoned hindsight, have chosen better words." These improper sallies were of two kinds.

The first comprised statements referring inferentially to the defendants' failure to take the stand, thus laying siege to their constitutional and statutory privilege not to testify or have an adverse inference drawn from the invocation of the

---

[14] The judge charged on the issue of "materiality" and left it to the jury. See *Commonwealth* v. *McDuffee*, 379 Mass. 353 (1979).

privilege.  See *Griffin* v. *California,* 380 U.S. 609 (1965);
G. L. c. 233, § 20.  The prosecutor said at separate places:
(i) "We presented all of that evidence.  And in rebuttal, in
opposition to what we did, what did the defendants do? Did
they give you during the course of this now seven or eight
days any evidence?  Did they present any evidence?"  (ii)
"Is there any credible evidence that [Ryan offered them a
deal]?  Think back on the evidence.  Outside of their
[defendants'] bare allegation, do they have anything to back
it up?  The answer is no."  (iii) "Did Mr. Ryan have any
reason to have conversation with this defendant [Hawley]
then [,] or later in company of Mr. Simons call him on the
telephone at jail, no less?  And is there any evidence to in-
dicate that he ever did?"[15]

In *Commonwealth* v. *Borodine,* 371 Mass. 1, 10 (1976),
cert. denied, 429 U.S. 1049 (1977), denial of habeas corpus
aff'd sub nom.  *Borodine* v. *Douzanis,* 592 F.2d 1202 (1st
Cir. 1979), we said that "[r]eferences to certain facts as 'un-
contested' are improper when the defendant himself is the
only one who can contradict the evidence."  Otherwise the
prosecutor could contrive by indirection to destroy the priv-
ilege, to trap the defendant through his exercise of the very
privilege.  See *Commonwealth* v. *Domanski,* 332 Mass. 66,
69 (1954).  *Desmond* v. *United States,* 345 F.2d 225, 227
(1st Cir. 1965).  "A claim that certain evidence is uncontest-
ed should be made with caution and only after careful re-
flection concerning the specific circumstances in which the
defendant could have produced contradictory evidence."
*Commonwealth* v. *Borodine, supra* at 11.  Here conversa-
tions are claimed to have occurred without third persons
present or with another present but antagonistic to the de-
fendants' interest.  Cf.  *Rodriguez-Sandoval* v. *United
States,* 409 F.2d 529, 530-531 (1st Cir. 1969), cert. denied,
414 U.S. 869 (1973) (testimony by government agent about
a narcotics sale between defendant and informant, witnessed

---

[15] These remarks were reinforced by statements that the defendants'
lawyer was not presenting evidence.

by agent, considered a transaction that only defendant could deny). To rebut the denials of conversations by Commonwealth witnesses, the defendants as a practical matter would have to take the stand and testify in support of their position as asserted at the March 4 hearing on withdrawal of pleas. Thus the rhetorical questions posed by the prosecutor were "reasonably susceptible of being interpreted as a comment on [defendants'] failure to take the stand which, of course, was improper." *Commonwealth* v. *Domanski, supra* at 69. And whether the alleged conversations took place went to the heart of the charges; the impropriety did not go merely to a "collateral" matter. Cf. *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 316 (1973).

The second type of impropriety lay in the prosecutor's suggestion that defense counsel was an active participant, if not the leader or mastermind, in the commission of the crimes of perjury, with the implication of a contrived plot by the three to assist the defense in the Graziano-Facente prosecution. (i) "You know, it is interesting. At one point counsel said, would these two defendants make up this story? And do you know what is interesting? That that lawyer who is on that other case down there signed these affidavits as a witness." (ii) "I am not going to go into that. You have the evidence. Is it a coincidence that this affidavit shows up one year after the sentencing, and it is witnessed by a lawyer who represents individuals who all of a sudden appear in affidavits as being involved in this case here in Pittsfield?" (iii) "Do you have any difficulty, — the Judge is saying this, — understanding any of the questions I have asked you? No sir. Did anything I have said confuse you in any way? No. But now, a year later, with Attorney Cavicchi as a witness to this statement, he [Gibney] makes [those comments by the judge] into some statement about Ryan going to give them ten more years or life."

The indicated suggestion, based merely on the fact that defense counsel witnessed affidavits by the defendants, went beyond any permissible inferences from the evidence to propound a motive for the perjuries charged. We do not

think the remarks were justified on the part of the Commonwealth as a retort to any hypothesis intimated by the defendants. Cf. *Commonwealth* v. *Burke,* 373 Mass. 569, 576 (1977); *Commonwealth* v. *McColl,* 375 Mass. 316, 325 (1978) (on "fighting fire with fire").

(b) *Reactions to improprieties by defendants and judge.* The defendants recorded objections to all the quoted statements of the prosecutor. After the first statement, they requested a mistrial but were overruled. The preferred action by the judge as to that statement would have been to charge the jury then and there; indeed, according to *Commonwealth* v. *Gouveia,* 371 Mass. 566, 571 (1976), "the better practice is for the judge to intervene on his own motion." This probably would have silenced the prosecutor at least on that line; instead he made two more like statements without check or reprimand by the judge. The judge repeatedly asked defense counsel not to interrupt, but he indicated that he would take care of "everything" in his final charge.

It is doubtful whether the final instructions overcame the vices in the prosecutor's summation. The prosecutor's asseverated comments on the defendants' failure to testify were not pointed to or called improper; what the jury heard was the usual generalities, part of a string of generalities. The generality, however, about no adverse inference being permissible from the defendants' failure to testify, was compromised by the judge's suggestion at two places that there was certainly nothing that now prevented defendants from testifying, as the old incompetency laws had been repealed. With respect to the damaging suggestion of connivance of counsel with the defendants, which might well also have called for immediate rebuke, there was nothing in the judge's instructions except that closing arguments were not evidence, and so forth.

It is fair to add that defense counsel could have done more to prompt the judge. Although registering objections currently, he did not at any point request immediate curative instructions, nor did he react to the judge's decision to take

care of everything in his charge, nor ask for more pointed or more complete instructions. Thus we face again a situation of prosecutorial misconduct, a less than fully adequate defense response, and a general charge that may not measure up to the occasion. See the cases collected in *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). Our cases have considered how far the prosecutor's remarks might have distorted jury deliberation and whether they were accidental or excusable or deliberate.[16] We have insisted on counsel's duty to alert the judge to prosecutorial abuse, but we have not made a fetish of the form or persistence of the objections, lest the accused suffer unduly from the inadvertence of his advocate.[17] We have examined the judge's response not only in respect to its formal correctness but also its capacity actually to reach to the trouble generated in the jury's mind, and the factor of timing is not unimportant.[18]

(c) *Aggravating factors.* There are special circumstances in the present case weighing against the Commonwealth. The first is that the perjury trial was little more than a redo on the prosecutor's side of the opposition to the motions to withdraw pleas. There were no surprises and the Commonwealth was well placed when the parties rested. Hence it was especially easy for the prosecutor to stay within "the scope of proper argument" in his summation, limiting himself "to the evidence and the fair inferences from the evidence." *Commonwealth* v. *Earltop, supra* at 205 (Hennessey, C.J., concurring).

---

[16] See, e.g., *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 419 (1978); *Commonwealth* v. *Borodine,* 371 Mass. 1, 11-12 (1976); *Commonwealth* v. *Redmond,* 370 Mass. 591, 596-597 (1976).

[17] See, e.g., *Commonwealth* v. *Shelley,* 374 Mass. 466, 469 (1978); *Commonwealth* v. *Earltop,* 372 Mass. 199, 203-204 (1977); *Commonwealth* v. *Domanski,* 332 Mass. 66, 69-70 (1954).

[18] See *Commonwealth* v. *Redmond, supra* at 596-597; *Commonwealth* v. *Graziano,* 368 Mass. 325, 332 (1975); *Commonwealth* v. *DeChristoforo,* 360 Mass. 531 (1971); *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 262 (1970).

Second, at issue were charges of perjury in contexts where the man in the street would be very clear that the accused must step forward to speak and confront his accuser. From this viewpoint, the case had a sensitiveness not present in the other cases cited. The prosecutor mistakenly took advantage of this obvious soft spot.

Third, here was a district attorney's office whose integrity was being challenged, but the same office was acting in the role of prosecutor. It cannot count as error that the judge refused a defense motion, at the eleventh hour, to appoint a special prosecutor, but that mode of proceeding might well have commended itself initially. The prosecutor should have been conscious of the strength of his artillery — testimony by officials and responsible lawyers trained on these defendants. He should have been particularly wary of overzealousness in what amounted to a defense of the reputation of his colleagues. The situation called for careful restraint notwithstanding any provocation, and in this the prosecutor faltered.

(d) *Evidence of guilt.* To a reader of the record the proof of the perjuries found by the jury is convincing. But in the past we have not washed out or condoned prosecutor's errors every time it could be said that the defendant was "guilty" or even plainly "guilty." Rather we have indicated that, where prosecutorial misconduct was serious or flagrant or repeated, and struck at the heart of a defendant's case, reversal of a conviction might be called for; especially so, where the defendant had made known his objections, even though not entirely artistically.

In *Commonwealth* v. *Redmond,* 370 Mass. 591, 597 (1976), we set aside a murder conviction because the prosecutor had "repeatedly and deliberately sailed unnecessarily close to the wind" in his cross-examination of the defendant and in his comments during closing. Counsel had timely objected to the improper questions and comments and the judge in every instance had given immediate curative instructions. "Significant prejudice" was found although "the case against the defendant was a strong one." *Id.* at

596. An important factor was that "[t]he case was largely presented as a contest between the account of [Commonwealth's witness referred to in closing] and the account of the defendant. The defendant's version was not such as to excite admiration." *Id.* at 597.

In *Commonwealth* v. *Shelly,* 374 Mass. 466, 470 (1978), using our special powers under G. L. c. 278, § 33E, to recognize errors not objected to, we set aside a conviction of murder in the first degree because of improper attacks in the closing on two expert witnesses called by the defense to establish insanity. The court said the prosecutor's "overreaching argument" was not confined to "collateral issues," in which case either "overwhelming evidence" of the defendant's guilt or "adequate curative instructions" by the judge might have rendered the conduct "harmless error." The comments "went to the very heart of the case." *Id.* at 470-471.

In other instances we have reversed for improper argument without characterizing the evidence as strong or weak. In *Commonwealth* v. *Domanski,* 332 Mass. 66, 71 (1954), the judge took no action on an objection to a closing argument that attacked a defendant by indirection for his failure to testify; his convictions were reversed, leaving standing the convictions of two defendants who had not been the objects of such remarks. See also *Commonwealth* v. *Burke,* 373 Mass. 569, 574-575 (1977) (prosecutor's argument based on excluded evidence); *Commonwealth* v. *Killelea,* 370 Mass. 638, 648 (1976) (prosecutor's statement that if defendant's insanity defense was accepted, defendant would go free).

6. *Summing Up.* The first impropriety — reference to the defendants' failure to testify — touched on the Fifth Amendment privilege incorporated into the Fourteenth, see *Griffin* v. *California,* 380 U.S. 609, 615 (1965), and the rule is that when a prosecutor offends in this connection, a conviction must be set aside unless it can be said that the misconduct in the totality of circumstances was harmless beyond a reasonable doubt. *Fontaine* v. *California,* 390

U.S. 593, 595-596 (1968) (per curiam). *Anderson* v. *Nelson,* 390 U.S. 523, 523-524 (1968) (per curiam). *Chapman* v. *California,* 386 U.S. 18, 23-24 (1967). *United States* v. *Blassick,* 422 F.2d 652, 654 (7th Cir. 1970). *Clark* v. *Nelson,* 411 F.2d 790, 791 (9th Cir. 1969) (per curiam). *Lussier* v. *Gunter,* 552 F.2d 385, 389 (1st Cir.), cert. denied, 434 U.S. 854 (1977).[19] The other kind of impropriety stirs up somewhat looser "due process" considerations. See *Donnelly* v. *DeChristoforo,* 416 U.S. 637, 642-643 (1974); *Borodine* v. *Douzanis,* 592 F.2d 1202, 1211 (1st Cir. 1979).

We would have some hesitation in holding that the prosecutor's stress on the defendants' failure to testify was "harmless" in this case beyond a reasonable doubt. At least we cannot be sure that a jury that chose to acquit on seven

---

[19] The First Circuit Court of Appeals has taken a stringent view of prosecutor's arguments in its own courts derogating from the defendant's right to remain silent, and has announced a rule that a prosecutor's characterization of evidence as "uncontradicted," where only the defendant is in a position to contradict it, shall constitute error requiring reversal without regard to any actual prejudice, unless the court "interrupts the argument, instructs the jury fully on the defendant's constitutional right not to testify and the jury's obligation not to draw unfavorable inferences and, in addition, states to the jury that the U.S. Attorney was guilty of misconduct." *United States* v. *Flannery,* 451 F.2d 880, 882 (1st Cir. 1971). But the court has stated that "[t]he *Flannery* rule . . . rests on our supervisory powers over the federal courts within this circuit. It was not addressed to the state judiciary, and insofar as it might require actions in some cases going beyond the strict requirements of the Constitution, we shall not apply it in *habeas* review of state proceedings." *Lussier* v. *Gunter,* 552 F.2d 385, 389 n.2 (1st Cir.), cert. denied, 434 U.S. 854 (1977). See also *Borodine* v. *Douzanis,* 592 F.2d 1202, 1209-1210 (1st Cir. 1979). In reviewing a petition for habeas corpus where the court believes that "the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify," the First Circuit has not applied its *Flannery* rule but has instead asked whether the error was harmless beyond a reasonable doubt. See *Lussier* v. *Gunter, supra* at 389 (quoting from *Knowles* v. *United States,* 224 F.2d 168, 170 [10th Cir. 1955]).

We have stated that "[o]ur practice has been less strict [than that announced in *Flannery*], and we are not prepared to follow the Federal example in all its rigidity." *Commonwealth* v. *Gouveia,* 371 Mass. 566, 571 (1976). But we have clearly recognized and reprobated the essential vice.

counts might not have been better disposed toward the defendants on some of the other counts, if on this point the Commonwealth's closing argument had been free of taint. Similarly we think the other improprieties cannot be discounted as trivial. But whether the prosecutor's mistakes taken in context quite reach to the point of infringing any constitutional right, or fall somewhat short, we are disposed to think, on the basis of all that has been considered above, that the course of justice would be best served by setting aside the judgments of conviction and letting the cases stand for a new trial.

*Judgments reversed.*

*Verdicts set aside.*