COMMONWEALTH *vs.* RONALD R. ROBERTS.

Middlesex. March 7, 1979. — May 15, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Conduct of prosecutor, Argument by prosecutor, Capital case. *Evidence,* Other offense, Prior conviction, Reputation, Cross-examination. *Witness,* Impeachment. *Joint Enterprise.*

Even though the prosecutor in a criminal case improperly described nonexistent proof in both his opening statement and closing argument to the jury, the defendant was not entitled to a new trial where, in view of the overwhelming evidence against the defendant, the prosecutor's remarks were superfluous and insignificant. [122-124]

There was no merit to a defendant's contention that police testimony at his criminal trial suggested that the defendant had committed other crimes. [124]

A defendant was not entitled to a new trial by the admission of evidence of other criminal conduct by the defendant where the evidence was relevant to show consciousness of guilt on the part of the defendant. [125-126]

Even though the prosecutor at a criminal trial violated G. L. c. 233, § 21, by attempting to use proof of the defendant's prior convictions for substantive, rather than impeachment, purposes, the defendant was not entitled to a new trial where the judge's immediate, force-

ful and clear limiting instructions were sufficient to obviate any harm to the defendant. [126-128]

At a murder trial during which the defendant claimed that his girlfriend had shot the victim, the judge did not err in excluding testimony by a witness that he had been told that the girlfriend caused trouble and that she once had attacked someone with a knife. [128-129]

At a murder trial, the judge did not err in his instructions to the jury on joint enterprise. [129-130]

INDICTMENT found and returned in the Superior Court on May 12, 1976.

The case was tried before *Hallisey*, J.

*Joseph F. Flynn* for the defendant.

*Susan C. Mormino*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant was convicted by a Superior Court jury of unarmed robbery and murder in the first degree. The trial judge imposed the mandatory sentence of life imprisonment for the murder conviction and, with the defendant's consent, placed the robbery conviction on file.

The defendant appeals, arguing error in (1) the prosecutor's opening and closing statements, (2) the prosecutor's direct examination of a Commonwealth witness and cross-examination of the defendant, (3) the judge's exclusion of certain evidence during trial, and (4) the judge's charge to the jury on joint enterprise. The defendant has also asked this court to exercise its broad powers of review under G. L. c. 278, § 33E, and reduce the jury's verdict of murder in the first degree to murder in the second degree or manslaughter, in the event that we do not order a new trial. We find no reversible error and see no reason to enter a verdict of a lesser degree of guilt than that found by the jury. Accordingly, we affirm.

Although we affirm the judgment, we have here another in a long series of cases marked by what we have called "prosecutorial error." See *Commonwealth* v. *Earltop*, 372 Mass. 199, 206 (1977) (Hennessey, C.J., concurring). The prosecutor overreached in two respects. First of all, as

will be seen, the prosecutor described nonexistent proof in both his opening statement and closing argument to the jury. We have condemned abuses of the privileges of argument in a series of recent opinions, and have found it necessary to order new trials in some of those cases.[1] Secondly, the prosecutor obviously attempted to use proof of the defendant's prior convictions of crime for substantive, rather than impeachment, purposes. These tactics fly in the face of our expressed concern in recent years that at best, and even handled with great care, proof of prior convictions might well be used by the jury in some cases for impermissible purposes.[2] We appreciate that the prosecutor here was undoubtedly motivated by his wish to present the case aggressively, as the public interest demands. Nevertheless, the methods here were clearly excessive, and additional and unnecessary appellate issues were created. It is merely fortuitous that the entire circumstances in the case are such that no new trial is required. We also observe, as we have on other similar occasions, see, e.g., *Commonwealth* v. *Earltop, supra* at 203, that defense counsel interposed no objection at any time during this series of erroneous steps by the prosecutor. As in the past, we once more find it difficult to understand why the present well-placed arguments of appellate counsel for the defense, addressed to prosecutorial error, apparently did not occur to defense counsel during

---

[1] See, e.g., *Commonwealth* v. *Hooks*, 375 Mass. 284, 295-297 (1978); *Commonwealth* v. *Earltop*, 372 Mass. 199, 203 (1977); *Commonwealth* v. *Gouveia*, 371 Mass. 566, 570-572 (1976); *Commonwealth* v. *DeChristoforo*, 371 Mass. 26, 38-39 (1976); *Commonwealth* v. *Burnett*, 371 Mass. 13, 18-19 (1976); *Commonwealth* v. *Borodine*, 371 Mass. 1, 9-10 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Killelea*, 370 Mass. 638, 644-649 (1976); *Commonwealth* v. *Redmond*, 370 Mass. 591, 594-597 (1976); *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 400-402 (1975); *Commonwealth* v. *Graziano*, 368 Mass. 325, 331-332 (1975).

[2] See, e.g., *Commonwealth* v. *Chase*, 372 Mass. 736, 750 (1977); *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 678-682 (1974) (Hennessey, J., concurring).

the trial, at least to the extent of stimulating seasonable objections.[3]

We summarize the pertinent facts as follows. In the early morning hours of December 26, 1975, John Telfair was shot in the head with a .22 caliber rifle and died as a result of the wound. The shooting occurred in Telfair's home at 58 High Street in Woburn. Telfair was eighty-seven years old at the time.

Radamus Colon, who lived with Elaine Roberts, one of the defendant's sisters, testified that sometime between 1:30 and 2:30 A.M. on December 26, 1975, the defendant and his girlfriend, Joanne Gallagher, arrived at Colon's home in Woburn. The defendant told Colon that he had done something, was afraid and wanted to leave town. When Colon asked what the defendant had done, the defendant replied that he had gone over to the house of the "colored guy on High Street," that the old man had pulled out a gun, that they "had a hassle with the gun," and that the gun went off. The defendant then offered Colon some money to drive him and Gallagher to an airport or train station. When Colon refused, the defendant and Gallagher left.

At a little after noon on the same day, Colon received a collect call from the defendant, who was then in Trenton, New Jersey. The defendant wanted to know whether Colon had heard anything about the death of the old man on High Street, and Colon replied that he had not. The defendant asked Colon to look in the newspapers and said that he would call Colon back. At approximately 3 P.M. that afternoon, the defendant called Colon from Camden, New Jersey, and asked Colon for the Camden address of Janice Roberts, another of the defendant's sisters, and John Vega, the man with whom she lived. Colon supplied the address.

---

[3] We note that neither appellate counsel for the Commonwealth nor appellate counsel for the defense participated at trial.

Vega testified that on December 27, 1975, he met the defendant and Gallagher and the three of them went to Vega's aunt's house, where the defendant's sister Janice was. The defendant showed Vega and Janice some money and asked Janice to count it. She counted somewhere between $500 and $600. After about an hour, Vega, Janice, the defendant and Gallagher went to Vega's apartment, where they drank and talked some more. The defendant said, "What a bum Christmas I had blowing somebody's brains out." The defendant went on to explain that he had gone to Telfair's house to ask him for some money, that Telfair refused but the defendant persisted, that Telfair pulled out a gun and the defendant took it away from him, after which he knocked Telfair down, took Telfair's wallet, and shot Telfair in the head. The defendant laughed as he said Telfair's "brains [blew] all over the walls." The defendant also stated that after the shooting, he and Gallagher searched Telfair's house, taking checks, pills, a radio, and a tape player, and that he then took the gun to his mother's house and told her to get rid of it.

Vega testified that he saw checks and "cans" of pills, bearing John Telfair's name, in the defendant's possession. The defendant asked Vega if he would try to cash the checks, and when Vega refused the defendant tore them up and threw them away. Vega did not see the radio or tape player. However, he did speak to someone who had purchased them.

The defendant and Gallagher stayed with Janice Roberts and Vega for several days, during which time the defendant drank constantly and repeated the above story several times. Janice Roberts's testimony basically echoed that offered by Vega and need not be repeated for purposes of this opinion.

John Kardeseski, the defendant's uncle, testified that sometime after Christmas he was given a .22 caliber rifle by his sister, the defendant's mother. He hid the rifle in his cellar. When Kardeseski next saw the defendant, the

defendant asked him if he had gotten rid of the gun.
Kardeseski replied that he had thrown it in the Mer-
rimack River, which in fact was not true.[4] The defendant
told Kardeseski that he had been "in trouble with it [in]
Rhode Island, New Jersey, or Connecticut or something."

The defendant took the stand at trial and testified as
follows. On the morning of December 25, 1975, he and
Gallagher were at her mother's house, drinking vodka.
Shortly after noon, they hitchhiked to Woburn, going
first to his mother's house and then to his grandmother's
house, where they continued drinking and had Christmas
dinner. Sometime between 1 and 2 A.M., they left his
grandmother's house and stopped at the home of John
Telfair, whom the defendant had known since childhood.
The defendant stated that his reason for stopping was
that it was snowing and he wanted to call a cab. He had
never known Telfair to have any money. Telfair invited
Gallagher and the defendant in, and they all sat in the
living room for a while. However, the living room was not
heated, so they moved upstairs to Telfair's bedroom
which was heated.

After talking in Telfair's bedroom for a few minutes
more, the defendant asked if he could use the telephone
downstairs and have a little of the whiskey he had seen
in the living room. Telfair agreed. While on the tele-
phone, the defendant heard a shot, ran upstairs, and saw
Telfair lying on the floor and Gallagher holding a gun in
her hands, looking "shocked." The defendant grabbed the
gun and he and Gallagher ran outside, locking the door
behind them. They went to his mother's house and he
gave her the gun. They then went to his sister's house in
Woburn, where the defendant spoke briefly to Radamus
Colon.[5] On the way there, Gallagher showed the defend-

---

[4] Kardeseski kept the rifle in his cellar until he turned it over to the
police. The Commonwealth introduced the rifle in evidence at trial.

[5] The defendant denied that he told Colon anything other than that
Telfair had been shot.

ant a wallet that she had taken from Telfair. The defendant took the money out and told her to get rid of the wallet, which she did.

After leaving Colon's house, the defendant and Gallagher went to Boson and boarded a train to New York. From there they went to Camden, New Jersey, where they stayed with Janice Roberts and John Vega for the next seven or eight days. The defendant testified that he drank the entire time he was in New Jersey. The defendant also testified that he told his sister and Vega that it was he who shot Telfair, because he wanted to protect Gallagher. Gallagher had given the defendant money upon his release from jail a few months earlier, and he had been living with her for approximately one month prior to the shooting.

1. *The prosecutor's opening and closing statements.* In his opening statement to the jury, the prosecutor made the following remarks: "[Janice Roberts and John Vega] will tell you that Ronald Roberts laughingly told them he went to the house of John Telfair, that he beat up the old man, that he took some money from the old man, that while Joanne Gallagher was counting the money the old man went to get a gun, that Ronnie Roberts knew the old man wasn't going to shoot him . . . so he took the gun from the old man, knocked him to the ground, held it to his temple, [and] pulled the trigger . . . . You'll hear that from the witnesses." In closing argument, the prosecutor stated, "I submit to you the conversation was that the old man grabbed a gun — 'I knew he wasn't going to use it on me, so I took it away from him' — Ronnie Roberts talking — 'He starting struggling, so I put the gun to his head [and] pulled the trigger.'" In fact, there was no testimony offered at trial as to the defendant's state of mind when he took the rifle from Telfair. Neither Janice Roberts nor John Vega quoted the defendant as saying that he knew that Telfair would not shoot him.

The defendant argues that the prosecutor's remarks constitute reversible error. There is no question that the

remarks were erroneous. However, defense counsel registered no objection or exception at trial and did not ask that curative instructions be given. Although in such circumstances we may still find reversible error, we will do so only upon a showing of grave prejudice or substantial likelihood that a miscarriage of justice has occurred. G. L. c. 278, § 33E. *Commonwealth* v. *Hooks*, 375 Mass. 284 (1978). *Commonwealth* v. *Earltop*, 372 Mass. 199 (1977). *Commonwealth* v. *Burnett*, 371 Mass. 13 (1976). *Commonwealth* v. *Borodine*, 371 Mass. 1 (1976), cert. denied, 429 U.S. 1049 (1977). *Commonwealth* v. *Coleman*, 366 Mass. 705 (1975). We conclude that, in the instant case, neither prejudice nor a miscarriage of justice has been shown.

Taken in context, the prosecutor does not appear to have been arguing from personal knowledge of facts not in evidence. See *Commonwealth* v. *Earltop, supra* at 203. Moreover, both the prosecutor in his opening and closing statements and the judge in his charge emphasized that the jury were the sole judges of the facts and that arguments were not to be treated as evidence. Most importantly, however, the information conveyed, even if believed by the jury, could have had but little practical effect.

The defendant argues that the prosecutor deliberately distorted the evidence in an effort to negate any inference that the killing was accidental or committed in sudden combat. There is no evidence of deliberateness, cf. *Commonwealth* v. *Redmond*, 370 Mass. 591 (1976), and, even assuming that accident and sudden combat were theories properly before the jury, the erroneous characterization of the defendant's state of mind was, at best, of minimal import. Much more damaging were the defendant's other admissions, and they were properly introduced in evidence at trial. John Vega and Janice Roberts testified that the defendant told them several times that he went to Telfair's house to ask him for money, that Telfair refused but the defendant insisted, that the old man

pulled out a gun and the defendant took it away from him, after which the defendant knocked Telfair down, took his wallet, held the gun to his temple and pulled the trigger. These admissions, most of which the jury would have had to believe in order to return their verdict of guilty, constitute overwhelming evidence of both felony-murder and premeditation, and when viewed in that light, the prosecutor's misstatement becomes superfluous and insignificant. In such circumstances, notwithstanding the prosecutor's error and our strong sentiment of disapproval, we will not reverse and grant a new trial. The interests of justice do not require it. Cf. *Commonwealth* v. *Bearse*, 358 Mass. 481 (1970).

2. *The prosecutor's direct and cross-examination.* Inspector Lally of the Woburn police department testified on behalf of the Commonwealth. On direct examination, the prosecutor first asked him about the events which led up to the issuance of complaints against the defendant. The prosecutor then asked, "And sir, to your knowledge; was there another parallel investigation going on of this case . . . [i]nvolving the same personages?" Inspector Lally replied that there was. The defendant did not make timely objection to the prosecutor's question and neglected to press for curative instructions. He nonetheless now argues that the testimony constitutes inadmissible evidence of his involvement in other crimes, and, as such, requires reversal. There exists no merit in the defendant's contention.

The prosecutor's question was phrased in terms of "this case," not another or others. It clearly referred to any pending police investigation into Joanne Gallagher's role in the events of December 25 and 26, 1975, and does not logically suggest that the defendant had committed other crimes. We will not presume the jury to draw irrational and unwarranted inferences from the evidence. Leaving aside defense counsel's failure to object and except, we conclude that there was no error.

During the prosecutor's cross-examination of the defendant, the following colloquy took place: THE PROSECUTOR: "And is it also true, sir, that when you were down in New Jersey, you went to the wrong address where you thought your brother-in-law and sister lived?" THE DEFENDANT: "Yes." THE PROSECUTOR: "And is it also true, sir, that when you couldn't get in, you kicked the door off the hinges to get into that apartment?" THE DEFENDANT: "I didn't kick the door off the hinges. I pushed the door in . . . ." Defense counsel objected and a bench conference ensued. During that conference the prosecutor stated that his purpose in pursuing this line of questioning was to establish flight and consciousness of guilt. The judge ruled the evidence admissible for that purpose. Defense counsel noted his exception and cross-examination continued. The substance of the defendant's testimony during continued cross-examination can fairly be summarized as follows: When the defendant arrived in Camden, New Jersey, he went to the wrong apartment and pushed open its door. The defendant contends that this testimony placed in evidence a crime or instance of bad conduct unrelated to the offense for which he was being tried, and thus warrants reversal. We disagree.

Evidence of a defendant's criminal or bad conduct is ordinarily not admissible at trial. See *Commonwealth* v. *Clifford*, 374 Mass. 293 (1978). However, otherwise relevant evidence is not rendered inadmissible simply because it may indicate that the defendant has committed another offense. *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372 (1978). *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976). Evidence that tends to show consciousness of guilt on the part of a defendant is always relevant at trial. See *Commonwealth* v. *Hogan*, 375 Mass. 406, 408-409 (1978); *Commonwealth* v. *Haney*, 358 Mass. 304, 306 (1970). The Commonwealth argues, and the judge below agreed, that the fact that the defendant "was not acting calmly and dispassionately [during his flight from the Commonwealth] supports the suggestion of guilty knowledge on

his part." We cannot say that the judge erred in making this determination, and we therefore hold that the evidence was properly before the jury. If the defendant wanted the judge to provide limiting or curative instructions, he should have made the proper request. Ordinarily judges are not required, sua sponte, to instruct juries as to the purposes for which evidence is offered at trial. See *Commonwealth* v. *Selesnick*, 272 Mass. 354, 357 (1930).

While cross-examining the defendant, the prosecutor also introduced records of the defendant's nine prior convictions. The defendant does not contest the admissibility of the convictions but, rather, the manner in which some of them were introduced. Specifically, after asking the defendant whether he was a violent person and eliciting a negative response, the prosecutor introduced the defendant's convictions for assault by means of a dangerous weapon, assault and battery, and larceny from the person. Additionally, while cross-examining the defendant about his flight to New Jersey, the prosecutor introduced the defendant's conviction for escape from a house of correction. Finally, after asking the defendant whether he cared for Joanne Gallagher and whether that was the reason he initially claimed responsibility for the shooting, the prosecutor introduced the defendant's convictions for assault with intent to rape and unnatural and lascivious acts with a child under sixteen.

The defendant argues that the juxtaposition of selected prior convictions with questions concerning matters to which the convictions were not unrelated gave those convictions substantive effect and went far beyond the impeachment purpose allowed by the Legislature. See G. L. c. 233, § 21. The Commonwealth counters that, "At most, the prosecutor could be charged with trying not only to impeach the defendant's credibility generally but also to impeach his credibility at important points in his testimony." Although we might accept this explanation with respect to the use of certain of the convictions, we cannot

accept it with respect to the use of others. The convictions for assault with a dangerous weapon, assault and battery, and larceny from the person were introduced immediately after the prosecutor asked the defendant whether he considered himself a violent person. This subject had not been brought up previously on direct or cross-examination. In effect, the prosecutor created a trap, which appears designed not to impeach the defendant's credibility but to establish substantively the defendant's propensity for violence. Given that, the prosecutor's conduct violated both the letter and the spirit of G. L. c. 233, § 21.

We nevertheless decline to reverse and grant a new trial, because the judge below intervened in a manner sufficient to obviate any harm to the defendant. We note once again that defense counsel raised no objection or exception at trial. Our powers of review are thus limited to preventing a miscarriage of justice. See G. L. c. 278, § 33E. After introduction of the convictions for assault by means of a dangerous weapon and larceny from the person, the judge instructed the jury as follows: "These convictions, ladies and gentlemen of the jury, are introduced only as they may affect your belief in what the witness is telling you, and for no other reason. They are not introduced to show that he is a violent person. So it would be improper for you to use them to that end." After introduction of the conviction for assault and battery, the judge repeated his earlier instructions and admonished the jury further: "So do not be misguided by the coupling of these questions about violent character, followed by proof of a conviction. They don't have any relationship. And if you started talking about a fellow with all of those convictions being a violent fellow, *you would be violating the instructions that I am now giving you.* All you can do with those convictions — and it is entirely up to you — is to say that I think that fellow who has those convictions may not be truthful, and consequently I discount what he said on the witness stand. It is for that purpose only that the convictions are permissible" (emphasis supplied).

During his general charge to the jury, the judge repeated the instructions set out above.

Although there are certain situations in which the prejudice to a criminal defendant is so great that limiting instructions cannot provide adequate protection, see, e.g., *Bruton* v. *United States*, 391 U.S. 123, 135-137 (1968), the situation described above is not one. The convictions introduced were of a substantially different character from the offense for which the defendant was being tried. See *Commonwealth* v. *Chase*, 372 Mass. 736, 749-751 (1977); *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 678-681 (1974) (Hennessey, J., concurring). Moreover, the judge instructed the jury immediately after the prosecutor's most egregious "juxtapositions," and again during the general charge, that they were to consider the convictions only in assessing the defendant's credibility. See *Commonwealth* v. *Leno*, 374 Mass. 716, 718-719 (1978). The effective operation of our criminal justice system requires that we trust juries to understand and apply limiting instructions correctly. The judge's limiting instructions in the instant case could not have been more forceful or clear, and the evil which they were intended to correct was the sort of evil which is capable of correction. Although the better practice might have been for the judge to ask the prosecutor to introduce evidence of the defendant's convictions all at once at some time during cross-examination, the course that the judge in fact chose to take was a sufficient remedy.

3. *Exclusion of certain evidence during trial.* During recross-examination of John Kardeseski, defense counsel sought to introduce evidence of the following: (1) that Kardeseski's mother and father were of the opinion that Joanne Gallagher caused trouble; and (2) that Kardeseski's sister once told him that Gallagher tried to kill his brother-in-law with a knife. After hearing the offer of proof, the judge excluded the evidence. The defendant now argues reversible error. More specifically, the defendant contends that, because his defense was that Gal-

lagher killed Telfair, he is entitled to present evidence of Gallagher's violent character.

The defendant's argument fails in at least two respects. First, character may not be used to show criminal propensity. *Commonwealth* v. *Turner*, 371 Mass. 803, 809-810 (1977). Second, even when character is properly in issue, it may be shown, apart from G. L. c. 233, § 21, only through evidence of general reputation. *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 755 (1961). See also *Commonwealth* v. *Edmonds*, 365 Mass. 496, 499-504 (1974). Personal opinions and isolated acts are not evidence of general reputation. See *Commonwealth* v. *Bumpus*, 362 Mass. 672, 681 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974); *Commonwealth* v. *Connolly*, 356 Mass. 617, 626, cert. denied, 400 U.S. 843 (1970). We conclude that there was no error.

4. *The instructions to the jury on joint enterprise.* The judge began his instructions to the jury on joint enterprise with the following remarks: "Now, it is possible, on the theory that the girlfriend did the shooting, that the defendant may nevertheless be guilty . . . of murder in the first degree, if you find that he was a joint venturer . . . . The concept of joint venture is not guilt by association. It is possible for a person to be present when the principal commits the crime, to acquiesce in the commission, to do nothing to prevent it, to fail to go to the aid of the victim, and to help conceal the crime, without being liable as a joint venturer." The judge then described the elements of joint enterprise referring, inter alia, to this court's decision in *Commonwealth* v. *Ambers*, 370 Mass. 835 (1976). The judge's description was perfectly consistent with our holdings in *Ambers* and other cases, and does not appear to be the source of the defendant's objection on appeal. Rather, the defendant contends that the judge should have told the jury specifically that if they failed to find the elements of joint enterprise, the defendant was entitled to acquittal. The contention has no merit.

As long as a judge gives adequate and clear instructions on the applicable law, the phraseology, method and extent of the charge are matters within his discretion. *Commonwealth* v. *MacDonald*, 371 Mass. 600, 603 (1976). *Commonwealth* v. *Therrien*, 371 Mass. 203, 206 (1976). *Commonwealth* v. *King*, 366 Mass. 6, 10 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts*, 419 U.S. 1115 (1975). The judge's instructions in the instant case were clear and more than adequate. Leaving aside the defendant's failure to object to the charge when given or to request a specific instruction, we conclude that there was no error.

5. *Review under G. L. c. 278, § 33E.* The defendant has asked us to reduce the jury's verdict of murder in the first degree to murder in the second degree or manslaughter. The grounds for this request are two: (1) he did not carry a weapon to the scene of the crime; and (2) he had been drinking at the time of the shooting and when he made his most damaging admissions. This evidence was introduced at trial, was treated properly in the judge's charge and was for the jury to evaluate. Consistent with our duties under § 33E, we have reviewed the entire record on the law and the evidence and conclude that the verdict was against neither.

*Judgment affirmed.*