## COMMONWEALTH vs. ROBERT J. CEFALO.

Essex. March 3, 1980. — August 18, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Search and Seizure. Probable Cause. Practice, Criminal*, Capital case, Opening statement by prosecutor, Instructions to jury, Argument by prosecutor, New trial. *Evidence*, Recross-examination, Other offense, Evidence at preliminary hearing, Impeachment of credibility.

Although an affidavit in support of a search warrant for a gun and certain articles of bloodstained clothing did not specifically mention the clothing, information in the affidavit justified an inference that blood-stained clothing might be found on the premises and the seizure of such clothing was, therefore, valid under the warrant. [327-330]

Police executing a valid search warrant for a gun and certain articles of bloodstained clothing were justified in seizing a bag containing other bloodstained items not specified in the warrant under the "plain view" exception to the warrant requirement. [330-332]

At a criminal trial there was no likelihood of a miscarriage of justice as a result of the failure of the prosecution to produce a witness whose expected testimony was outlined in the prosecutor's opening statement where the substance of the absent witness's purported testimony was introduced through another witness and there was no evidence of bad faith on the part of the prosecutor. [332-333]

At a criminal trial, the judge did not abuse his discretion in excluding on recross-examination of a Commonwealth witness a question which referred to matters not adverted to on redirect-examination. [334-335]

At a criminal trial, there was no error in the judge's instructions regarding use by the jury of prior convictions to assess credibility. [335-336]

At a criminal trial, a question by the prosecutor which adverted to the defendant's commission of an unrelated crime did not give rise to a miscarriage of justice where it was defense counsel who first alluded to the subject and where the line of questioning was not pursued and defense counsel requested no limiting or curative instruction. [336-337]

At a criminal trial, questions to a defense witness by the prosecutor, in an attempt to show recent fabrication, as to whether the witness had been present at the probable cause hearing and whether he had spoken to representatives of the Commonwealth at that time did not violate G. L. c. 278, § 23. [337-338]

INDICTMENT found and returned in the Superior Court on May 17, 1976.

The case was tried before *McNaught*, J., and a motion for a new trial was heard by him.

*Joseph F. Flynn* for the defendant.

*Dyanne Klein Polatin,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. On October 18, 1976, the defendant was convicted of murder in the first degree and sentenced to life imprisonment at Massachusetts Correctional Institution, Walpole. He appeals from this conviction, and from the denial of the second of his two motions for a new trial.[1]

The defendant raises three issues which were preserved by objection and exception. He argues: (1) that the search of his hotel room and seizure of items therefrom was illegal; (2) that limitation on recross-examination of a Commonwealth witness was improper; and (3) that the trial judge erred in denying a motion for a new trial on the basis of blood tests performed after the trial.

In addition, he raises six issues for the first time on appeal. He challenges: (1) failure of the prosecution to produce a witness whose expected testimony was outlined in the prosecutor's opening statement; (2) the judge's instructions regarding use by the jury of prior convictions to assess credibility; (3) allusions by a Commonwealth witness to a prior crime allegedly committed by the defendant; (4) references to the probable cause hearing by the prosecutor; (5) statements made by the judge to one Lee K. Callahan regarding her decision whether to testify at the defendant's trial; and (6) statements made by the prosecutor in his closing argument. Finally, he urges this court to reduce the conviction to murder in the second degree or manslaughter. We find no error, and affirm the conviction and the denial of a new trial.

---

[1] The first of his new trial motions was denied on April 4, 1977, but there is no appeal from the denial thereof. The second was filed on January 19, 1979.

We summarize the relevant evidence. At approximately 2:10 A.M. on February 29, 1976, a motorist approached a police cruiser of the city of Lynn. As a result of the information received from the motorist, Officers George Clarke and Roy Mullen proceeded to the corner of Orchard and Summer Streets, where they observed a black Ford Thunderbird automobile with the driver's door partially open and a person's leg protruding from the car. They found a body in the car, which they recognized as that of James Daniel Hynes. Hynes' body and the inside of the automobile were spattered with blood, and there was blood about Hynes' mouth and head.

The police officers left the scene of the crime to go to a nearby Dunkin Donuts shop, which they knew was frequented by Hynes' roommate, Harry Shamberger. There they asked Shamberger if he knew that Hynes was dead, and Shamberger said he did. He would not then tell them more, but later at the police station he gave a full account implicating the defendant. His statement was reduced to writing.

Harry Shamberger testified that he and Hynes had observed a dark green Cadillac automobile, with Callahan and the defendant riding therein, on the evening of February 26, 1976. Shamberger asked the defendant if he had "made a score," because of the car. The defendant, Hynes, and Shamberger exchanged angry words, and Hynes hit the defendant, who had alighted from the car. He fell to the ground, got up, and told Hynes that he "hit like a broad." This less than friendly banter continued, whereupon Hynes hit the defendant again. The police arrived, and the defendant and Hynes shook hands.

Shamberger said that on the evening of the homicide, February 28, he and Hynes were at the Lynn Tap and Grill until closing time, 1 A.M., then went to Jeffries' Lounge on Buffum Street in Lynn. After fifteen or twenty minutes, Hynes said he was not feeling well and left in his black Thunderbird to go home. Shamberger stayed only five or ten minutes more, until 1:25 or 1:30 A.M., then walked

home. It took him fifteen to twenty minutes to arrive at Walden Street, which intersects with Summer Street a short block from the scene of the crime. He saw the same Cadillac he had seen on February 26 pass by him at a slow speed and recognized the passenger as the defendant. The car proceeded along Summer Street toward Breed Square, then turned and headed back toward Shamberger. Shamberger stepped into a driveway when he saw the car turn around. The car came to a stop almost directly across from him, on Summer Street. Shamberger observed that Lee Callahan was driving. In order to avoid being seen, Shamberger positioned himself against the back fence of the driveway.

The defendant got out of the car and walked to 498 Summer Street and started up the steps. Just then, Hynes' Thunderbird came down the street.[2] After the car stopped, the defendant ran toward it. He got behind the Thunderbird, took his left hand from his pocket and put an object into his right hand — Shamberger could not see the object. The defendant knocked on the window of the Thunderbird, the door opened, and "then he had just reached in and fired." The gunshots lit up the car's interior. Shamberger heard two fast shots, then possibly another, but he was not certain.[3] He estimated that the shooting occurred at about 1:50 or 1:55 A.M. The defendant reached into the car briefly and "did something" to Hynes. Then the defendant ran to the Cadillac, which "took off at a fairly high rate of speed."

Shamberger did not check Hynes' condition, but walked away for some distance, eventually stopping at the Dunkin

---

[2] The Commonwealth did not produce any evidence to explain why it had taken Hynes longer to drive home than it took Shamberger, who left later, to walk the same distance. Officer Mullen testified that he saw Hynes' car pass him on Summer Street at approximately 1:45 A.M., heading in the direction of Hynes' apartment. He did not notice a Cadillac parked there, however, and did not see the defendant.

[3] Thomas L. Morgan, a resident of 498 Summer Street, testified that he heard what sounded like a car backfiring at 1:55 A.M. by the clock in his kitchen, where he was watching television.

Donuts shop on Western Avenue. He stood in the parking lot, because he "felt pretty sick," then he went inside. After the police arrived, he accompanied them to the station, where he told them what he had seen.

After Shamberger told his story, Office Mullen went from the Lynn police station to the home of Joseph Curcio in Lynn. Curcio returned with Mullen to the station and made a statement. Curcio, a taxicab dispatcher in Lynn, testified at trial that he had lent his Cadillac to Lee Callahan, the defendant's girl friend,[4] shortly after midnight on the morning of February 29. She returned it at 2:05 A.M. that same morning.

Chesley Ronald Taylor, Jr., testified that he was at the Pinecrest Bar in Central Square, Lynn, on the evening of February 28-29, 1976. The defendant came into the bar alone, spoke to the bartender (who testified that the defendant unsuccessfully requested a loan of thirty dollars), and proceeded to the other end of the bar where he uttered profanities to Herbie Michel, a customer seated at the bar, and slapped Michel across the face. The defendant then left the bar. He returned shortly after midnight, with his girl friend, Lee Callahan. He was in a good mood and offered to buy everyone a drink. Taylor refused the drink because of the earlier incident with Michel. Taylor and the defendant got into an argument and went outside to fight. After hitting him once, Taylor decided that the defendant "was in no condition to fight any more," and Taylor reentered the bar. A moment later, the defendant also went inside, where he kept insulting Taylor and wanted to fight again. The defendant was bleeding from the mouth. He accused Taylor of breaking his dental plate. The bartender gave the defendant some towels and told him to clean up, which he did, and then the defendant left with Callahan. The bartender closed the bar at 1 A.M., but he and two patrons remained inside. Some time later, the three men heard knocking on the door. The bartender went to the door,

---

[4] Lee Callahan's trial was severed from that of the defendant.

noticed that the clock on the wall read 1:50 A.M., and discovered the defendant and Callahan at the door. He told the defendant to "forget about it" and "straighten it out tomorrow." The defendant and Callahan then left. On the way back into the bar, the bartender noticed a second clock, and it was still 1:50 A.M.

After Shamberger related his story, he took police to the scene of the homicide and pointed things out. Captain Courtney ordered some officers to stake out the Olympic Hotel. The police obtained a search warrant for room 1-A of that hotel, where Shamberger said the defendant resided. They also obtained a warrant for the defendant's arrest. They found the defendant and Callahan in bed and arrested both, seizing articles of clothing and other items from the room. Further details concerning the search and seizure are given below.

Dr. George Katsas, the State pathologist, performed an autopsy on Hynes later that morning. He testified at trial that the autopsy revealed four bullet wounds on the face, with two bullets having penetrated the brain. He said the cause of death was multiple gunshot wounds with perforation of the brain, and hemorrhage.

Kenneth Gagnon, a State chemist, testified that he performed certain tests on the items seized from the defendant's room and from the defendant's person. All items with blood stains, including the defendant's dental plate, contained group "O" type blood stains. Hynes' blood was tested and found to be group "O." Stains from the inside of the Thunderbird in which Hynes died were also found to be group "O." Nowhere in the record, including that of the second motion for a new trial, does information appear regarding the blood type of the defendant.

1. *Legality of the search and seizure.* The defendant argues that the seizure of the clothing was not justified under the search warrant and supporting affidavit, because the latter did not on its face establish probable cause for the magistrate to believe that bloodstained clothing would be at the Olympic Hotel. In addition to Federal and State con-

stitutional grounds, he bases this argument on G. L. c. 276, §§ 1, 2, 2A, 2B. He argues further that the seizure of a bloodstained jacket and shirt at the hotel cannot be justified by the "plain view" doctrine because the discovery of these items was not "inadvertent." See *Coolidge* v. *New Hampshire*, 403 U.S. 443, 464-473 (1971).

a. *Items seized.* When police entered the defendant's hotel room, Lieutenant McGarity noticed a tan leatherette jacket and blue shirt hanging on the partially opened closet door. He placed them on the floor under the window. Officer Jenkins, who had jumped the defendant (then naked), removed him from the bed, and handcuffed him, seized the jacket and shirt from their location under the window. The defendant was allowed to put on some clothing which was on the floor. The pants and shoes he put on were later taken from him at the police station. Also seized from the room was a brown paper bag containing a bloodstained handkerchief, blood stained tissues, a matchbook, all introduced in evidence; and other items not introduced and therefore not here relevant.[5] No gun was ever found, although an extensive search was made in the room and near the scene of the crime.

b. *Findings and rulings below.* The judge denied the defendant's pretrial motion to suppress, both as to the items seized in the hotel room and the clothing taken from the defendant at the police station. He denied a renewed motion to suppress at the trial.

The judge found that "[t]he warrant authorized the seizure of any gun found on the premises, and a leather jacket and shirt such as were seized. The supporting affidavit [as the defendant concedes] contained ample informa-

---

[5] At the police station, the police took from Lee Callahan (after booking her) a jacket, in the pocket of which they found a bloodstained partial denture, some paper napkins (also bloody) and a matchbook. These items were introduced by the defense at trial, presumably because they supported an inference that blood on all the items belonged to the defendant and not the victim. In any event, they were not the subject of the motion to suppress.

tion to find probable cause for the search for the gun on the premises. There was nothing in the supporting affidavit concerning clothing." Treating the seizure of the jacket and shirt as warrantless, the judge upheld the seizure of these items on a plain view rationale.[6] He further ruled that the articles of clothing taken at the police station were validly seized incident to a lawful arrest, and the defendant does not challenge this ruling. Although he found as a fact that the police, while in the hotel room, seized the brown paper bag containing "apparently" bloodstained items, he made no ruling of law concerning these items.

c. *Validity of hotel room search.* The warrant specified, in addition to a gun (never found), "Blood Stained Clothing including Light Brown or Tan leather or Leatherette Sport Coat." The statement attached to the affidavit made no specific mention of bloodstained clothing or the leatherette jacket, although Officer Foley did mention these items in the printed form affidavit.

The affidavit made by Officer Foley states in support of his application for a search warrant that in his investigation at the scene of the crime he saw Hynes' body and learned that Hynes had been pronounced dead by a medical examiner. It further describes Foley's conversation with Shamberger, in which the latter said that he was Hynes' roommate, that he had seen the defendant and a female in the Cadillac on Summer Street, and that he had seen the car stop, the defendant alight, and "walk up to Hyne[s'] vehicle with a handgun behind his back and [that] shortly thereafter he observed gunfire being fired into the Hynes vehicle." The affidavit also states that Shamberger told Foley that the defendant lived in room 1-A of the Olympic Hotel, and it concludes: "Based on the above investigation involving the death of James Hynes lately of Lynn and my

---

[6] The defendant is correct that the seizure of these items was not "inadvertent." In addition to evidence that police had been told about them by Shamberger, there was testimony that the officers were looking for these items when they went into the room. See note 9, *infra*.

conversations with Mr. Harry Shamberger who witnessed the above crime, and my conversation with Mr. Joseph Curcio, there is probable cause to believe that Robert J. Cefalo currently living in Room 1-A at the Olymp[ic] Hotel 375 Washington St., Lynn, is in possession of a handgun which caused the death of James D. Hynes."

We first consider whether the judge was correct in ruling that the search warrant did not allow the police validly to seize the jacket and shirt from the hotel room. We construe the question to turn on two issues: whether the warrant met constitutional and statutory particularity requirements and whether the statement supporting the affidavit must directly mention each item specified in the warrant.

i. *Particularity.* The Fourth Amendment to the United States Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 14 of the Declaration of Rights of the Massachusetts Constitution requires both that "the cause or foundation of [warrants must be] previously supported by oath or affirmation" and that the warrant contain "a special designation of the persons or objects of search, arrest, or seizure . . . with the formalities prescribed by the laws."

The particularity requirement was enunciated in *Marron* v. *United States,* 275 U.S. 192, 196 (1927): "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." See *Commonwealth* v. *Wojcik,* 358 Mass. 623, 625 (1971), and cases cited. The requirement applies to the description in the warrant itself — and its rationale is to limit the discretion of the officer executing the search warrant. See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467 (1971). We are of the opinion that the warrant at issue here, taken alone, provided a description sufficient to justify seizure of the shirt and

jacket. Officer Jenkins, who seized both, testified at the probable cause hearing that both appeared bloodstained when he seized them. Thus the jacket and shirt came within the description in the warrant.

ii. *Probable cause.* We next consider in what manner the affidavit must establish probable cause for those items listed in the warrant. The purpose of the affidavit is to provide the magistrate issuing the search warrant with information from which he can decide whether there is probable cause to issue the search warrant. *Aguilar* v. *Texas,* 378 U.S. 108, 114-115 (1964). The question therefore becomes: probable cause for what?

The Fourth Amendment and art. 14 do not define "probable cause," and courts have often used the concept of probable cause to arrest interchangeably with probable cause to search. 1 W.R. LaFave, Search and Seizure § 3.1 (1978). See, e.g., *Spinelli* v. *United States,* 393 U.S. 410, 416 (1969) (where issue was whether search warrant was issued with probable cause, court considered detail given by informant in *Draper* v. *United States,* 358 U.S. 307 [1959], dealing with arrest warrant, as "suitable benchmark"); *United States* v. *Truitt,* 521 F.2d 1174, 1177 (6th Cir. 1975). This court too has used the arrest standard in the context of an affidavit for a search warrant. See, e.g., *Commonwealth* v. *Alessio,* 377 Mass. 76, 79 (1979) (that "criminal activity took place where [the informant] claimed it did"); *Commonwealth* v. *Snow,* 363 Mass. 778, 784 (1973) ("that an offence probably has been or is being committed"). In the case of a search warrant, as distinguished from an arrest warrant, the affidavit must, in order to establish probable cause, contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they may reasonably be expected to be located in the place to be searched. See *Zurcher* v. *Stanford Daily,* 436 U.S. 547, 554-557 & n.6 (1978); *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 54-55 (1974); *People* v. *Mitchell,* 61 Ill. App. 3d 99, 102 (1978); LaFave, *supra* at 96, 441-442; Comment, 28 U. Chi. L. Rev. 664, 687 (1961).

We have held that oral statements given to a magistrate may not be considered in the probable cause determination. *Commonwealth* v. *Monosson,* 351 Mass. 327, 330 (1966). Oral statements may be considered, however, when they do not bear on the probable cause determination. *Commonwealth* v. *Cuddy,* 353 Mass. 305, 309 (1967). Cf. *Commonwealth* v. *Rugaber,* 369 Mass. 765, 768 (1976), quoting from *Commonwealth* v. *Murray,* 359 Mass. 541, 548 (1971) ("[f]actual inaccuracies not going to the integrity of the affidavit do not destroy probable cause for a search"). Of course, police may not expand the warrant beyond those facts known to them. See *VonderAhe* v. *Howland,* 508 F.2d 364, 369 (9th Cir. 1974) (informant's tip disclosed to Internal Revenue agents that dentist kept yellow sheets and green cards listing additional income; warrant authorizing seizure of many other types of records invalid).

We have upheld a search warrant which described the property to be seized in greater detail than did the affidavit. *Commonwealth* v. *Cuddy, supra.* In *Cuddy,* underlying facts known to the police justified the description in the warrant. *Id.* at 308-309. We have also looked to affidavits and complaints to provide specificity when read together with a search warrant. *Commonwealth* v. *Vitello,* 367 Mass. 224, 272 (1975). *Commonwealth* v. *Todisco,* 363 Mass. 445, 448-450 (1973). *Commonwealth* v. *Pope,* 354 Mass. 625, 629 (1968). The question here, however, is not whether the warrant and affidavit together provided the requisite specificity, but whether the affidavit provided probable cause to search for the items listed in the warrant.

The affidavit need not "state in minute detail facts with which almost everyone is familiar," and the issuing judge may draw inferences from the affidavit. *Commonwealth* v. *Moran,* 353 Mass. 166, 170 (1967). "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in [the reading of affidavits]. . . . [W]here reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the war-

rant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States* v. *Ventresca,* 380 U.S. 102, 108-109 (1965). *Commonwealth* v. *Taglieri,* 378 Mass. 196, 198-199, cert. denied, 444 U.S. 937 (1979).

Our reading of the affidavit leads us to conclude that, while it might have included more facts then known to the police,[7] it justifies an inference that bloodstained clothing worn by the defendant may have been in room 1-A of the Olympic Hotel, where the defendant resided. The statement supporting the affidavit stated that the defendant "fired into the Hynes vehicle," and that the medical examiner reported that Hynes' death was from a gunshot wound in the head. Therefore, the warrant is valid in so far as it authorized police to search for bloodstained clothing. Cf. *People* v. *Mitchell, supra* at 102-103.

iii. *Items not mentioned in warrant.* We next consider the seizure of the bag containing bloodstained items. When items in plain view are seized but are not described in the warrant, the Commonwealth bears the burden of showing at the hearing on the motion to suppress that, at the time of seizure, it was apparent that the items bore a nexus to the crime committed. *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 304 (1979). The bag containing the bloodstained handkerchief and tissues was not named in the warrant, and there is no evidence that the police expected to find it in the hotel room. The inference from the affidavit that the defendant may have been spattered with blood when he shot the victim, however, would support a conclusion that bloodstained items were related to the crime. See *Commonwealth* v. *Meehan,* 377 Mass. 552, 560 (1979), cert. granted, 444 U.S. 824; cert. dismissed as improvidently granted, 445 U.S. 39 (1980); *Commonwealth* v.

---

[7] The statement Shamberger made to the police on February 29, 1976, at 7 A.M. includes the observations, "I saw Cefalo sort of reach in [to the victim's car] with his gun and fired point blank at Danny's face," and "Cefalo reached into the car, and he did something to Danny, — touched him, or did something to Danny." It also stated, "I know that Cefalo was wearing a light brown leather jacket and dark pants."

*Ross,* 361 Mass. 665, 681-682 (1972), vacated and remanded on other grounds, 410 U.S. 901, aff'd on remand, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973). The judge found, correctly, that the affidavit provided probable cause to conclude that a handgun might be present in the hotel room. The police therefore had the right to look inside the paper bag, to see if it contained a gun. Once they spotted the bloodstained materials, they had reason to believe the items were related to the crime and to seize them. See *Coolidge, supra* at 465; *Ross, supra*; *Wojcik, supra*; *Commonwealth* v. *Appleby,* 358 Mass. 407, 414 (1970); *State* v. *Clark,* 592 S.W.2d 709, 714 (Mo. 1979). See also *Warden* v. *Hayden,* 387 U.S. 294, 300-301 (1967) (rejection of "mere evidence" rule). Compare *State* v. *Wilson,* 279 Md. 189, 192-195 (1977), with the present case.

In addition to the "nexus" requirement, the other two prongs of the *Coolidge* test for seizure of items in plain view were met here: the police were lawfully on the premises pursuant to both a valid arrest warrant, and a search warrant, the validity of which is discussed above;[8] and the discovery of the items in the bag was "inadvertent" in the sense that police lacked probable cause before entering the room to believe the items would be there. See *United States* v. *Liberti,* 616 F.2d 34, 36-37 (2d Cir. 1980); *United States* v. *Hare,* 589 F.2d 1291, 1293-1296 (6th Cir. 1979); *State* v. *Clark, supra* at 713.[9]

---

[8] Prior justification may include a warrant for another object. *Coolidge, supra* at 466.

[9] We have sometimes referred to the inadvertence requirement of *Coolidge, supra,* in terms of "unanticipated" or "unexpected." See *Commonwealth* v. *Accaputo,* 380 Mass. 435, 450 (1980); *Commonwealth* v. *Bond,* 375 Mass. 201, 206 (1978); *Commonwealth* v. *Walker,* 370 Mass. 548, 557, cert. denied, 429 U.S. 943 (1976). Such a strict standard for inadvertence creates a difficult problem for police who have a "hunch" or "suspicion" that an item may be found, but who do not have enough knowledge to justify a finding of probable cause to name the item in the warrant. This problem has led some courts to construe "inadvertence," not defined in *Coolidge,* to mean lack of probable cause. See *United States* v. *Liberti,*

We conclude that the seizure of the jacket and the shirt at the hotel was authorized by the warrant, and that the Commonwealth has met its burden (see *Antobenedetto, supra* at 57) of showing that the seizure of the bag from the hotel room was justified under the "plain view" exception to the warrant requirement. This case involved no violation of the Fourth Amendment, art. 14 of the Declaration of Rights, or G. L. c. 276, §§ 1, 2, 2A, or 2B.

2. *Failure to produce witness.* In his opening statement, the prosecutor stated that "[t]here will be testimony from a Mr. Michel and a Ronnie Taylor that a couple of things occurred that night at the Pinecrest. Herbie Michel will testify that Mr. Cefalo asked him for some money, subsequently slapped him across the face a couple of times, pulled a knife out, but didn't cut him up in any way. . . . [B]oth Mr. Michel and Mr. Taylor will state that [after the fight with Taylor] blood was on Mr. Cefalo's mouth." Michel never appeared as a witness at the trial.

The defendant neither objected nor excepted to the failure to produce Michel, but he now argues that this failure coupled with the prosecutor's opening remarks constituted a miscarriage of justice,[10] in that the remarks "served as the

616 F.2d 34, 36-37 (2d Cir. 1980); *United States* v. *Hare,* 589 F.2d 1291, 1293-1296 (6th Cir. 1979).

This definition of "inadvertence" to mean something less than probable cause is of course applied in conjunction with the other two *Coolidge* tests (prior justification for presence and that the relationship to the crime of the item in plain view be immediately apparent) and with the requirement that police must limit the scope of their search according to the reason for their valid presence (if pursuant to a valid search warrant, to places where the item[s] named might be found). This scheme carries out the Fourth Amendment purpose of forbidding general exploratory searches, see *Coolidge, supra* at 467, without unjustifiably limiting police to the seizure only of items by which they are totally surprised.

The difficulty with the "inadvertence" requirement has led at least one court to hold that, since that part of the *Coolidge* opinion was signed by only four Justices, it is not binding on the States. See *State* v. *Pontier,* 95 Idaho 707, 712 (1974). See also 2 W.R. LaFave, Search and Seizure § 4.6, at 112 (1978).

[10] For the standard of review under G. L. c. 278, § 33E, where there has been no objection or exception, see *Commonwealth* v. *Cole,* 380

sole corroboration for Shamberger's testimony that the defendant possessed and used a dangerous weapon." We disagree.

The alleged error in the present case is unlike that of *Commonwealth* v. *Bearse,* 358 Mass. 481, 486-487 (1970), where in his opening remarks, the prosecutor claimed he would prove that the defendant had said that he would kill his son, and then failed to prove the statement. We said that the prosecutor's remark might well have tipped the verdict from acquittal to conviction. In the present case, the substance of Michel's purported testimony was introduced through Taylor, except that the latter did not mention a knife. Taylor testified that the defendant "gave [Michel] a couple of slaps across the face," and Taylor and the bartender both testified about a fight Taylor had with the defendant. Shamberger testified about a fight the defendant had with the victim. If offered to prove that the defendant had violent tendencies, Michel's testimony would merely have been cumulative. The homicide was committed with a gun, not a knife, and we are not of the opinion that the defendant's propensity to use dangerous weapons, even if inferred from the prosecutorial statement, would have contributed significantly to the verdict.

Furthermore, the prosecutor said several times that his opening statement was not evidence, and the judge so instructed the jury after the defense had made a limited opening. There was no instruction to the jury on the Commonwealth's failure to produce Michel, but neither was there any objection which would have brought the matter to the judge's attention. See *Commonwealth* v. *Breese, ante* 13, 15 (1980); *Commonwealth* v. *Fazio,* 375 Mass. 451, 454 (1978); *Commonwealth* v. *Shelley,* 374 Mass. 466, 472-473 (1978). There was no evidence of bad faith on the part of the prosecutor, and we have said that in such a situation we will not presume bad faith. *Fazio, supra* at 454-455. There was no "miscarriage of justice."

Mass. 30, 38 (1980); *Commonwealth* v. *Roberts,* 378 Mass. 116, 123 (1979), and cases cited.

3. *Alleged restriction on recross-examination.* The defendant alleges that the judge erred in not allowing him to inquire of Officer Foley at trial about the circumstances surrounding his preparation of the affidavit in support of the search warrant. The judge sustained the prosecutor's objection to the question: "And in preparing your affidavit in order to support the search warrant you eventually obtained did you make a full and complete report of the statement that Mr. Shamberger gave to you?"[11] The defense counsel offered to prove that he anticipated an affirmative answer to his question. The defendant claims that such inquiry might have aided him in impeaching the officer's testimony.

The exclusion of the question was properly within the discretion of the judge, who may "limit recross-examination to new matter adverted to on redirect-examination." *Commonwealth* v. *Gordon*, 356 Mass. 598, 602 (1970). Accord, *R.L. Polk & Co.* v. *Living Aluminum Corp.*, 1 Mass. App. Ct. 170, 172 (1973). Cf. *Commonwealth* v. *Pickles*, 364 Mass. 395, 401 (1973). There was no reference on redirect to Foley's written report of Shamberger's statement[12] and,

---

[11] Neither the ground for the objection nor the ground for the ruling appears in the transcript.

[12] The defendant alleges in his brief that "no questions were asked [on direct examination] about whether Officer Foley had prepared a report related to the conversation [with Shamberger at the Lynn police station]." The prosecution did not elicit testimony on redirect that Foley had prepared a written report of Shamberger's statement, but only that he had prepared an affidavit. The following colloquy occured on redirect:

> THE PROSECUTOR: "Now, recalling your attention to a period of time you were at the police station and Mr. Shamberger was there for approximately two or three hours being interviewed, did you partake in that interview by way of observation?"
> THE WITNESS: "Yes, I did."
> THE PROSECUTOR: "As a result of the observations that you made and the conversations that you heard, did you cause something to be done by way of a typewritten report?"
> THE WITNESS: "Yes."
> THE PROSECUTOR: "And what type of report is that called, sir?"
> THE WITNESS: "An affidavit for a search warrant."

Both the defense and the prosecutor later read from Foley's typewritten report when examining Shamberger.

although defense counsel might have used that report to impeach Foley had he received an affirmative answer, we think the judge did not abuse his discretion in disallowing that line of inquiry.

4. *Instructions on credibility.* The defendant alleges that the instructions given by the judge following the introduction of prior convictions of Commonwealth witnesses Taylor and Shamberger, and again in the charge to the jury, were erroneous. See G. L. c. 233, § 21. Although he took no exception to the instructions, he contends that they constituted a miscarriage of justice.

The judge in essence told the jury that crimes involving dishonesty could be given more weight in assessing credibility than other crimes. The language used by the judge was slightly more forceful than necessary.[13] Each time he gave such an instruction, however, he unequivocally stated that it was for the jury to determine what weight they wished to give the prior convictions.

"Our cases have recognized that which common sense suggests: convictions of some crimes may affect credibility more or less than others." *Commonwealth* v. *Bumpus,* 362 Mass. 672, 683 (1972), judgment vacated on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974), reviewed on petition for habeas corpus sub nom. *Bumpus* v. *Gunter,* 452 F. Supp. 1060 (D. Mass. 1978). As long as the judge informs the jury that they are the "ultimate arbiters of credibility," he may properly give the instruction which was given in this case. 362 Mass. at 683. See *Commonwealth* v. *French,* 357 Mass. 356, 406 A-42 (1970), judgments vacated as to death penalty sub nom.

---

[13] With regard to the witness Taylor, the judge said: "[Y]ou may take into consideration *the fact* that the commission of some crimes bears more on the credibility than the commission of others" (emphasis supplied). He gave a hypothetical example of a conviction for trespass, saying "if somebody who walks across my lawn who is not supposed to do so[,] I don't think that has much of a bearing on whether that person will tell the truth." In his final charge, he said "conviction of certain crimes *obviously* has a greater or lesser bearing upon credibility than others" (emphasis supplied).

*Limone* v. *Massachusetts,* 408 U.S. 936 (1972); *Quigley* v. *Turner,* 150 Mass. 108, 109 (1889).

5. *Association of defendant with another crime.* During the redirect examination, the prosecutor read from a copy of the statement Shamberger gave the police. The statement included the observation: "When I saw Cefalo turn around I immediately thought of° the house broken into and I assumed that Cefalo was coming back to this house on Summer Street." The prosecutor then asked the witness, "Sir, what were you referring to in that statement when you meant the break in your apartment?" Defense counsel objected, an unrecorded bench conference was held, and this line of questioning was not pursued. Defense counsel did not except to the incident or request a curative instruction, but claims that it constituted prosecutorial misconduct which rose to the level of miscarriage of justice.

"Evidence of a defendant's criminal or bad conduct is ordinarily not admissible at trial." *Commonwalth* v. *Roberts,* 378 Mass. 116, 125 (1979). *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978), and cases cited. The test of admissibility is whether the relevance of the evidence outweighs its possible prejudicial effect. See *Roberts, id.*; *Commonwealth* v. *Deschamps,* 1 Mass. App. Ct. 1, 3-4 (1972).

Had the prosecutor been responsible for first bringing to the attention of the jury that portion of Shamberger's statement alluding to a housebreak by the defendant, the argument presently made by the defendant would have more force than it does. In fact, the record reveals that it was defense counsel who first read this portion of the statement to the jury on cross-examination. The bench conference following the question the prosecutor posed to Shamberger was not recorded and does not appear in the transcript. Therefore the basis of the defense objection is unclear. We assume, however, that counsel objected to allowing Shamberger to explain in detail the allusion to a housebreak, even though the defense had raised the matter on cross-examination. In any event, the line of questioning

was not pursued. The defense requested no limiting instruction, and no curative instruction on the prosecutor's reference to "your apartment," and there was no judicial duty to instruct sua sponte. See *Roberts, supra* at 126. We can see no basis for complaint by the defendant in these circumstances.

6. *References to probable cause hearing.* Two defense witnesses, Walter Orechva and Allen Benoit, testified that they witnessed an argument about drugs between Hynes and Shamberger on the evening of Hynes' death. On cross-examination the prosecutor attempted to show recent fabrication by eliciting the fact that neither witness had gone to the police. In so doing, the prosecutor asked Orechva if he had been present in the court room at the probable cause hearing (to which he responded in the affirmative), and whether he had spoken to representatives of the Commonwealth at that time (to which he responded in the negative). The defendant argues that the reference to the probable cause hearing violated G. L. c. 278, § 23.[14]

The primary theory of the defense was that Shamberger had both motive and opportunity to commit the homicide.[15] The only witnesses who offered direct testimony to support this theory were Orechva and Benoit, and, indirectly, Donna Taylor.[16] Thus Orechva and Benoit were "pivotal to

---

[14] General Laws c. 278, § 23, as amended by St. 1978, c. 478, § 305, provides as follows: "At the trial of a criminal case in the superior court, upon indictment, or in a jury-of-six session in a district court, the fact that the defendant did not testify at any preliminary hearing in the first court, or that at such hearing he waived examination or did not offer any evidence in his own defense, shall not be used as evidence against him, nor be referred to or commented upon by the prosecuting officer."

[15] The Commonwealth contends on appeal that defense counsel argued alibi in his closing argument, making use of the bartender's testimony which placed the defendant at the Pinecrest Inn at 1:50 A.M. Although defense counsel did refer to Commonwealth witnesses' testimony and asked the jury to remember how long it took them to go from the Pinecrest to the crime scene when the jury took their view, there was no defense testimony on alibi. The primary thrust of defense testimony and cross-examination was to implicate Shamberger.

[16] The only other defense witnesses were Donna Taylor, who testified that the victim had delivered heroin to her husband; the defendant's

the defendant's defense." See *Commonwealth* v. *Maguire*, 375 Mass. 768, 774-775 (1978); *Commonwealth* v. *Paradiso*, 368 Mass. 205, 210 (1975). The prosecutor did not ask Orechva directly if he testified at the probable cause hearing, however. See *Commonwealth* v. *Palmarin*, 378 Mass. 474, 477-478 (1979); *Commonwealth* v. *Morrison*, 1 Mass. App. Ct. 632, 635-636 (1973). Cf. *Commonwealth* v. *Sneed*, 376 Mass. 867, 869-870 (1978). He did not ask Benoit about the probable cause hearing at all. There was no comment by the prosecutor on the failure of the defendant to testify, either at trial or at the probable cause hearing, nor was there any comment that the defendant "did not offer any evidence in his own defense" at the probable cause hearing. See G. L. c. 278, § 23. The thrust of the questioning was to suggest that Orechva and Benoit both had prior opportunity to tell their stories to Commonwealth representatives and did not do so. This was a proper mode of impeaching these witnesses by showing recent contrivance or bias in favor of the defendant. In the absence of questions or comment suggesting that the defendant did not call any witnesses at the probable cause hearing, there was no violation of G. L. c. 278, § 23.

7. We have considered the defendant's remaining claims of error and find them to be without merit.

a. The judge's remarks to Callahan, who had not yet been tried, on the question whether she should testify in the present case were clearly intended to safeguard her rights and did not exceed the bounds of the judicial role.

b. The prosecutor's remarks in closing argument, telling the jury not to be "naive," did not convey a sense that he had knowledge of the guilt of the defendant or allude to facts not in evidence. Especially in the absence of an objection or exception, we see no error. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 203-204 (1977).

---

daughter, who testified that she visited her father the day after the crime and his mouth was swollen and bloody; and Lieutenant McGarity, who testified that, in investigating the crime, Shamberger was never a suspect as far as he was concerned, and that he had had a preconceived opinion of who was guilty.

c. There was no error in the denial of a new trial. The blood tests performed on the seized clothing two years after the trial were inconclusive at best, and their relevance in the context of the standards for new trial motions was not demonstrated at the hearing. There was no showing that the tests could not have been performed before the trial. The evidence therefore was not "newly discovered." See *Commonwealth* v. *LaBriola,* 370 Mass. 366 (1976); *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229 (1973).

8. We perceive no reason, after a review of the record and the transcript, to grant the defendant any relief under our power under G. L. c. 278, § 33E.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*